**SQUIRE, Plaintiff-Appellee, v INDUSTRIAL COMMISSION, Defendant-Appellant**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 20212. Decided July 1, 1946.

Cerrezin & Wilson, Cleveland, for Plaintiff-Appellee.

H. S. Jenkins, Attorney General, C. H. Bernard, Asst., Columbus, for Defendant-Appellant.

## OPINION

By SKEEL, PJ.

This is an appeal on questions of law from a judgment of the common pleas court by which plaintiff appellee was

given the right to participate in the fund administered by defendant.

Plaintiff is the widow of Donald Squire, deceased. Donald Squire before his death was an employee of the City of Cleveland. His work was that of a plumber. His employment with the City of Cleveland began Sept. 27, 1937. One of the tasks that was assigned to him was to work on the rebuilding of filter beds, which were being used in the purification of water.

At the bottom of the filter beds were lateral pipes which were held into a manifold by leaded joints. These lateral pipes were perforated so that as the water passed through the sand and gravel with which the filter beds were filled it would be collected in such pipes and from there pass through the manifold to clear water storage tanks.

The rebuilding of the filter beds required that the sand and gravel be removed and then the plumbers would melt the lead out of the joint where each lateral pipe was fitted into the manifold. To do this an acetylene torch was used. In burning out the lead joints with the acetylene torch a very heavy bluish-gray smoke was given off. A witness testified that this smoke was heavier than air and therefore stayed in the filter for some time before it was dissipated. There was a disagreeable odor from the smoke which caused those who came into contact with it to cough. The City, to protect the plumbers from the smoke caused by the melting of the lead out of these joints, provided a mask which was to be worn at all times while engaged in such work.

The decedent and one other employee, both plumbers, would take turns in working with the acetylene torch and while one was using it the other would leave the filter pit because there was only one mask. On the days that this work was being done these two men would divide their time so that each would share equally in doing the work required to burn out the joints on a particular day. The records of the water department disclose that from Sept. 27, 1937, until June, 1938, there were thirteen occasions, averaging three days each, when these men worked on removing laterals, the last time beginning on May 20th to 24th, 1938.

Plaintiff's petition alleges in part that on the 24th day of May, 1938, while melting the lead from the joints of the laterals of the filters, plaintiff was * * * "accidentally exposed to an inhalation of an unusual amount of such gas, smoke and fumes and shortly thereafter he coughed and expectorated and became nauseated * * *." It is alleged fur-

ther that as a proximate result of such accidental exposure to such gas fumes and smoke and the inhalation thereof, he developed coronary thrombosis from which he died on June 20, 1938.

Upon trial a verdict was returned for the plaintiff.

This appeal on the part of the defendant on questions of law alleges seven grounds of error.

1. The common pleas court erred in overruling defendant's motion for a directed verdict at the close of plaintiff's testimony and again at the close of all the testimony.

2. The court erred in permitting plaintiff to introduce evidence over the objection of defendant, which ruling was prejudicial to the rights of the defendant.

3. The court erred in excluding evidence offered on behalf of the defendant.

4. The verdict of the jury is contrary to law.

5. The court erred in giving the special charge before argument as requested by plaintiff.

6. The verdict of the jury is manifestly against the weight of the evidence.

7. And further errors apparent on the face of the record.

There is no evidence in the record which tends in the slightest degree to support the allegations of plaintiff's petition that the plaintiff's decedent was accidentally exposed to an unusual amount of gas fumes or smoke on the 24th day of May, 1938. All of the witnesses who were called to testify as to the smoke, gas and fumes produced in melting the lead out of the joints of the laterals with the manifold, referred to the process generally and not one word of testimony attempts to say that what happened on May 24, 1938, was any different than what took place on the twelve preceding occasions when the deceased was engaged in doing this work. The witness upon whom plaintiff relies for the most part on this question was William Broderick, the deceased's fellow-employee, who worked with him and divided the time with the deceased in burning out the lead joints. He testified in part as follows:

"Q. Mr. Broderick, I understand that Mr. Squire and yourself did this type of work there, the only two of you, is that right?

A. Oh no, there was a man before Mr. Squire.

Q. I mean when Mr. Squire was alive and the two of

you worked together, it was just the two of you did this type of work?

A. That is right.

* * * * *

Q. And as this work was being done, the burning of the laterals, was there any fumes created?

* * * * *

A. Well, we proceeded to melt these out with the acetylene torch. There was a blue—whether it was a gas or a fume or whatever you might call it—it was very bluish, and it was heavy and it came off of the operation of the melting of the lead joint out. To my estimation it is heavier than air. It wouldn't rise. It sort of hangs in the filter. How, what type of a gas or fume you might call that, I don't know.

* * *

Q. Tell us what you saw when this happened?

A. Well, when we proceeded to molt out the joint with the acetylene torch, that would throw off a blue smoke or a gas or a fume or whatever you might call it, and it seemed to be very heavy and it would hang in the filter. It was heavier than air. It wouldn't rise.

* * *

Q. What smell, if any, did it have, if you smelled it? If you inhaled it what smell would it have?

A. It is pretty hard to say. There was an odor but for me to explain it to you it is impossible.

Q. Was it an offensive odor or otherwise a stink?

A. Well, when we proceeded to melt out the joint with agreed with you.

Q. If you inhaled it would you cough or vomit or anything like that?

A. Well, I never vomited from it, but if you get real close to it, it will make you cough, if you are burning and the mask got away from you.

* * *

Q. And you said that would remain on the bottom of the filter? It would not rise? It was heavier than the air? Is that right?

A. It seemed to hang in the filter. What I am trying to explain, ordinarily when you have a hot gas come up, the first thing it will do is go right up but this seemed to hang in there.

Q. Where Mr. Squire was required to work, and also where you worked, in burning these laterals, you may state whether or not you were on the bottom of these so-called filters?

A. That is where the work was, on the bottom of the filter.

* * *

Q. Will you kindly explain to the Commission what length of time Mr. Squire would remain in this filter doing this type of work, burning the laterals where this gas or fumes were formed?

* * *

A. Well, the procedure, the way we always worked it out, we split up the time. He would go in in the morning and I would go in in the afternoon. If I went in in the morning he would go in in the afternoon.

Q. In other words, you would make it about a half a day affair, is that right?

A. That is right.

* * *

Q. After the beginning of burning these laterals, say, for one hour, will you kindly describe the air in these filters?

* * *

A. Well, I thought I tried to explain that before, what this blue smoke that would come off of there, how it hung low, which wasn't very pleasant odor; it didn't agree with you; you would sooner be out where there was good air.

* * *

Q. And there was no provision made to pump the air inside into this filter?

A. There was no provision to pump the air in; only that the mask that we used had what they call an air purifier on it, and the air that went to the mask was washed by water.

Q. Now how long did you have this mask in use for this type of work?

A. Oh, I don't know just the exact date we had it. We were using other types of masks but we weren't satisfied with them; and this here one we got, I don't know just the exact date.

Q. Was the mask always used by Mr. Squire and yourself in doing this type of work?

A. Yes, always used. Whether he ever took it off while he was down there or not I don't know, because usually when one was down there the other would get out, see, because we only had one mask.

* * *

Q. You don't know of your own knowledge whether or not he used the mask?
* * *

A. I say we had the mask down there. After he got burning if he took it off, that I don't know.
* * *

Q. Directing your attention to May 24th you may state insofar as you could observe, how did Mr. Squire appear to you insofar as ability to work was concerned?

A. Mr. Squire was a good workman.

Q. Have you ever seen him vomit or complain of stomach pains or otherwise?

A. Well, he did for a while complain of stomach pains.

Q. About when?

A. Oh, on and off for about four weeks.

Q. Before he died?

A. Yes.

Q. And have you seen him do anything toward the end, did he vomit or cough or anything like that? Have you noticed?

A. I never noticed him vomit. If he did, probably I wouldn't have been around."

Two other witnesses, Albert J. Cavlak, City Bacteriologist assigned to duty at the Filtration Plant, and Tony Velloney, Labor Foreman at the Filtration Plant, were called on behalf of the plaintiff but their testimony was confined to a description of the process or burning out the laterals and the smoke or gas caused thereby. They did not mention any occurrences, unusual or otherwise, that took place on the 24th day of May, 1938. Therefore, there is a complete absence of any evidence to support the allegations of the plaintiff's petition upon which she bases her right to participate in the state insurance fund, that is that on the 24th day of May, the deceased while acting within the scope of his employment was "accidentally exposed to an inhalation of an unusual amount of such gas, smoke and fumes * * *."

In the case of **Jenning v Toledo-Edison Co., 59 Oh Ap 139,** the plaintiff decedent had been employed by defendant a self-insurer under the Workmen's Compensation Act as a laborer. A part of his work had been to assist in moving coal from a reserve storage pile to what was called a "dry pocket" so it would be in position for use in defendant's plant. Some of the coal in the storage dump had become "ablaze from

spontaneous combustion." The fire had been put out but the gas and sulphur smell continued. As this coal was being removed some of it would stick to the hopper pockets of the car in which the deceased was working and it was the decedent's duty to clean it out and in doing so would be subject to the fumes and gas coming from such coal. On January 4, 1934, Jennings was suffering from a severe cold which developed into "lobar pneumonia" which caused his death on Jan. 10, 1934. It was contended by plaintiff that the death of Jennings was accidental under the Workmen's Compensation Act in that it was "proximately caused by specific inhalation of noxious gas and fumes at a specific time which were greater in intensity than normal, such exposure and inhalations were definite as to time and place of occurrence and decedent was not constantly exposed and subjected to such gases and fumes which inhalations aggravated a pre-existing condition of irritation and proximately produced the malady causing his death."

The court in affirming a verdict directed for the defendant said on pages 141-142 of the opinion:

"As it appears to us, the evidence fails to disclose the occurrence of an accident or specific injury within the meaning of the Workmen's Compensation Law. If what Jennings was doing had anything to do with his subsequent condition, it arose from the nature of his employment—work that he had been employed to do and which he had been doing in exactly the same way and under the same conditions during several years preceding. It was a part of his regular employment and the fact that when not thus engaged he also did other work would not exclude it from that category. It is not and cannot be claimed that anything unusual or different happened in the doing of the particular work on January 4, to differentiate it from the way it had been done on the three preceding days or during any of the times during his employment when it became necessary in the unloading of coal cars."

In the case of **Industrial Commission v Palmer, 126 Oh St 251**, the supreme court had for consideration a case where it was alleged that decedent came to his death as a result of being subjected to unusual and severe attacks of carbon monoxide gas on two specific occasions. In holding that if such facts were established the defendants would be entitled

to compensation under the Workmen's Compensation Act, the court said (syllabus 1):

"Where it was disclosed by the evidence that a workman in the course of his employment was subjected to unusual emissions of carbon monoxide gas upon two specific occasions and that his disability and death resulted therefrom, an award of compensation under the Workmen's Compensation Act will be sustained."

And on page 254 of the opinion the court explains the rule as follows:

"The record shows that the decedent was subjected continually to the emissions of carbon monoxide gas. * * *. If this were all the testimony upon the point that the decedent was subjected to emissions of carbon monoxide gas, and if there were no evidence in the record of unusual emissions of gas upon certain specific occasions, recovery would have to be denied."

And so, in the case now being considered, the evidence introduced by plaintiff clearly establishes that the circumstances under which decedent worked on May 24, 1938 were no different than they had been on all prior occasions. That it was a part of his work to burn out the laterals in exactly the same manner and under the same conditions as the work was done on that day. There was no unusual emission of gas, smoke or fumes to which decedent was subjected on that day. Nor does the evidence disclose that on any prior occasion he suffered any physical injury or discomfort from carrying on this part of the work. His fellow employee, William C. Broderick, who did exactly the same work under the same circumstances for a much longer period of time than decedent, did not suffer any harmful results so far as is disclosed from his testimony. And further, even though the expert testimony describing the gases that are produced by melting lead with an acetylene torch was given, these witnesses do not say in what quantity such gases were produced or whether the mask which was used was or was not protection against such gases when properly used, nor is there any evidence that decedent did not use the mask. It is a matter of common knowledge that carbon monoxide gas is lighter than

air and such gas therefore would not have remained in the filter pit. Carbon dioxide gas is heavier than air, is absorbed readily in water and therefore a mask which purifies the air by water would be a complete protection against whatever dangers there might be thereby created. Carbon-dioxide gas is not harmful to humans except in large quantities, as is disclosed by the pamphlet of the Department of Labor referred to in plaintiff's brief. In fact it is the basis of soda water and other beverages that are in common use. All of the allegations of fact which vitally affect the rights of plaintiff are therefore not supported by any evidence and the jury was left to speculate about them.

We therefore conclude that the court was in error in overruling defendant's motion for a directed verdict at the conclusion of plaintiff's case and repeated again at the conclusion of the taking of all of the testimony in the case because of plaintiff's failure to introduce evidence to support all of the necessary elements of her case.

Defendant's claim of error for permitting the introduction of incompetent evidence over defendant's objection has to do with plaintiff's use of her medical witnesses to express opinions on the chemical results of melting out lead caulking with an acetylene torch. It is clear that the subject of the inquiry was in the field of chemical science and not medicine. Nor was there any attempt to qualify the witnesses as experts in the field of chemistry other than to ask them whether or not they were familiar with the acetylene torch and with lead and had the means of knowing what gases if any would be created by melting such lead with the heat created by an acetylene torch.

Although it seems doubtful that these witnesses could be of valuable assistance to the jury, in attempting to analyze the chemical results of the melting lead with an acetylene torch yet the question of the admissibility of such evidence is within the sound discretion of the court.

In Jones' Commentaries on Evidence, 2nd Ed. Vol. 3, page 2411, §1317, the author says:

"* * * When a witness is offered as an expert it becomes a preliminary question for the court to determine whether he has the requisite qualifications * * *."

Section 1318, page 2412 provides:

"It is the prevailing rule that the decision of the trial court as to the competency of an alleged expert is a preliminary question resting in the discretion of the court. Unless founded on some error of law, or on serious mistake or abuse of discretion, the ruling of the trial court on this preliminary question is not reversible."

"No exact standard by which to determine the competency of the witness exists and much is necessarily left to the discretion of the trial court. Some of the cases go very far upon this point, for some of them hold that the decision of the trial court, is conclusive. However, we think the cases which hold that, where there is no evidence at all tending to prove that the witness is qualified to testify as an expert, or where there is palpable abuse of discretion, the ruling of the trial court is subject to review, are supported by the better reason."

We cannot say that the court abused its discretion in admitting the evidence and therefore appellant's claim of error on this ground is overruled.

The hypothetical questions that were propounded to the medical witnesses were long and involved but for the most part set forth the facts which plaintiff relied upon for her right to recover. Generally speaking, it is for the jury to say whether or not the facts included in the hypothetical questions have been established by the preponderance of the evidence. And if such facts are established and are sufficiently inclusive of the pertinent facts in the case so that the answers would be of value to the jury in arriving at its verdict, the court should overrule an objection to the question. But the omission of the important matter of the use of a mask and the effect it might have upon one who might otherwise be subjected to the inhalation of obnoxious gases; is a fact without which an intelligent answer would be most difficult. In Jones' Evidence in Civil Cases in the last part of paragraph 371, page 560, the author says:

"* * * It is error, though, to allow an expert to answer a hypothetical question which excludes from his consideration facts already proved by the testimony upon which the question is based when a consideration of such facts is essential to the formation of an intelligent opinion

concerning the matter. Also the court should reject questions which unfairly select part of the facts proved or which omit material parts."

The court therefore committed prejudicial error in permitting the said hypothetical questions to be answered.

Defendant's contention that the court erred in excluding evidence offered by it through its expert in explanation of his opinion given to a hypothetical question is well taken.

In Jones' Commentaries on Evidence, 2nd Ed. Vol. 3, §1342 on page 2453, the author says:

"Since even on direct examination expert witnesses are allowed to state the reasons for their opinion, clearly the same latitude must be allowed on cross-examination."

And in Corpus Juris Secundum, Vol. 32, §521 at page 216, the rule is stated as follows:

"The party offering an expert is at liberty to reinforce his judgment, even before any attempt is made to discredit or impeach it, by showing the grounds on which it is based * * *."

See also: Commercial Standard Ins. Co. v. Robinson, 151 S. W. 2nd, 795 (Texas App. 1941). Dickinson et al vs. Inhabitants of Fitchbert, 79 Mass. 546.

The rule is well settled that the question put to the defendant's expert witness asking him to state his reasons for his opinion, was a proper question and the court's sustaining an objection thereto and excluding such testimony constituted reversible error.

The members of this court are unable to agree on the question as to whether or not the verdict is against the manifest weight of the evidence and therefore the defendant's contention in this regard is overruled.

All other claims of error are overruled.

For the reasons given above, the judgment of the common pleas court is reversed and final judgment is entered for the defendant.

LIEGHLEY, J, concurs.
MORGAN, J, dissents.