SURMAN, APPELLANT, *v.* OHIO & PENNSYLVANIA OIL & GASOLINE CO. ET AL., APPELLEES.*

(No. 25365—Decided June 14, 1962.)

*Motion to certify the record overruled (37715), December 5, 1962.

454

*Messrs. Sindell, Sindell, Bourne & Markus,* for appellant.
*Messrs. Arter, Hadden, Wykoff & Van Duzer, Messrs. Merkel, Campbell, Dill & Zetzer* and *Messrs. McAfee, Hanning, Newcomer & Hazlett,* for appellees.

SKEEL, J. This appeal comes to this court on questions of law from a judgment for the defendants entered by direction of the court upon motion at the conclusion of the presentation of plaintiff's evidence. The action is one seeking damages for the alleged acts of concurrent negligence of the defendants as set out in plaintiff's third amended petition.

In the early evening of August 10, 1955, at about ten minutes after seven p. m., the plaintiff was injured while in the Gateway Restaurant in the village of Andover, Ohio, when an explosion of great intensity occurred within the building whereby the building was destroyed by the force of the explosion and the fire that followed.

There were a number of other defendants served in this action as it was originally filed, including the proprietors of the restaurant and the local gas company distributing natural gas to the people of Andover, the latter two, with others, which included the Sinclair Refining Company, being dismissed by a covenant not to sue upon settlement of the plaintiff's claim as alleged in the third amended petition, the amount received totaling $1,200 to this plaintiff. Other defendants were dropped out of and not included in the second and third amended petitions. The defendants still in the case upon the filing of the third amended petition were the Standard Oil Company, the village of Andover, and Herbert Swezey and Oren Barnes, individually and doing business as Swezey's Garage, a partnership operating a gasoline station on the opposite corner of the public square of the village from the restaurant (some 475 feet away), and the Ohio & Pennsylvania Oil & Gasoline Company, which company owned and operated a gasoline service station on the south side of the public square about 375 feet from the restaurant.

After setting out certain of the regulations for the manufacture, storage, handling, sale and transportation of petroleum

products promulgated by the State Fire Marshal of Ohio (said to be in effect under the authority of Section 3737.17, Revised Code), the effective date not being shown by the evidence, the plaintiff alleges, as proximately causing his injuries, six claims of negligence against the defendant the Ohio & Pennsylvania Oil & Gasoline Company, which are to the effect that it negligently permitted gasoline to spill and leak onto and into the ground and into the drains and sewers so as to constitute a nuisance; that it installed and maintained underground piping and tanks for the storage and delivery of gasoline without protecting such equipment against corrosion; that it failed to maintain such equipment as required by and in violation of Section 203.9 of the State Fire Marshal's regulations and contrary to usage and custom of those engaged in such business so as to allow leakage to develop and to thus enter the drains and public sewers; that it failed to inspect and test such equipment to discover leaks before injury resulted; that it failed to detect underground leaks by the exercise of reasonable care; and that it failed to warn the public and officials of Andover of the spilling and leakage of gasoline to permit the dangerous condition to be eliminated to prevent injury to others.

Like allegations are set out against the defendants Swezey and Barnes, individually and doing business as Swezey's Garage, and the Standard Oil Company, it being charged that these last named defendants were engaged in a joint enterprise and that they were themselves each careless and negligent through their servants and employees acting within the scope of their employment to the extent and in the manner charged. The claims of negligence against the village of Andover are that it negligently maintained a sewer system without adequate ventilation so as to permit inflammable and explosive substances to accumulate in dangerous quantities and concentration; that it permitted the ventilation afforded to be decreased or eliminated by paving over "pick holes"; that it failed to inspect and test said sewer to discover the accumulation of explosive and inflammable substances therein in time to warn the plaintiff of the dangers and to disperse or otherwise render harmless accumulated explosive and inflammable substances in said sewer; and that it failed to abate the nuisance created by the accumulation of inflammables and explosives in said sewer operation.

The defendant village of Andover filed its answer by which it denies all the allegations of plaintiff's petition. The remaining defendants, by separate answers, admit the capacity in which they are engaged in business and that there was an explosion in the Gateway Restaurant in Andover on the evening of August 10, 1955, wherein the plaintiff received some injury, but deny each and every other allegation as to them as set out in the petition and further allege the plaintiff's settlement with other defendants dismissed from the case and the amounts paid by each to this plaintiff.

Therefore, the issue presented is whether there is any credible evidence to support the separate alleged acts of negligence as set out against each of these defendants proximately resulting or contributing to plaintiff's injuries.

At the outset, consideration will be given to the question of whether the claims against the village of Andover, insofar as they state a cause of action in the maintenance of its sewer systems, are supported by any credible evidence. The claims of negligence against this defendant have been stated above. The Supreme Court of Ohio has held that the duty of a municipal corporation in the maintenance of its sewers is a proprietary and not a governmental function. In the case of *Doud* v. *City of Cincinnati*, 152 Ohio St., 132, the court, in the third paragraph of the syllabus, said:

"3. Although a municipal corporation is not liable for damages growing out of a dangerous condition which suddenly arises in connection with the use or operation of its sewers until it has actual or constructive notice of such dangerous condition, yet, since the municipal corporation has a duty of inspection of its sewer as an instrumentality under its supervision and control, it becomes chargeable with notice of what reasonable inspection would disclose, including defects which may arise through the slow process of deterioration."

On page 137, the opinion of the court supported this paragraph of the syllabus by saying:

"The defendant seeks to escape liability on the ground that it had no notice of the defect in the sewer which caused the damage to plaintiff's property. It is true that a municipality is not liable for damages growing out of a dangerous condition which suddenly arises in connection with the use or operation

of its streets, sewers or other structures, until it has actual or constructive notice of such condition. * * *''

Some contention has been made in argument, but not supported by credible evidence, that the onrush of the flood water caused by the sudden heavy rainstorm caused gasoline to be forced into the restaurant through the sanitary sewer. Without some evidence that a proper inspection of its sewers by the village would have disclosed that gasoline in dangerous quantities had leaked into the sewer (such evidence being totally absent from the record), certainly any dangerous condition resulting entirely from the storm would not support a claim of negligence against the village under the authority of *Doud* v. *City of Cincinnati, supra.*

The hydraulic engineer called as an expert by the plaintiff (the only witness who attempted to support the claim that gasoline which was said to have been permitted, through the negligence of the service stations [defendants herein], to leak into the ground, which gasoline was claimed to have entered the restaurant causing the explosion) testified that there were eight possible ''manmade channels'' by which the gasoline was directed from the point of its release to the point of the explosion. Five of these channels were the separate ditches in which had been constructed the sanitary sewer, the storm sewer, telephone ducts, gas mains, and water mains. There is no credible evidence to identify which of these suggested possible channels was, in fact, the channel or channels by which gasoline (if such were the fact) reached the restaurant. The determination of this question could result only from a guess. The case against the village, therefore, failed and it was properly discharged at the end of the plaintiff's case.

The case against the Standard Oil Company is based on the allegations of the petition that it is engaged in a joint enterprise with the defendants Swezey and Barnes as individuals and doing business as Swezey's Garage in the operation of their gasoline filling station, and that therefore it is liable for their (Swezey and Barnes') negligence. There is no evidence to support this contention. The lease between the Standard Oil Company and Swezey's Garage makes it perfectly clear that no such relationship was intended or created by its terms, and the conduct of the parties, as disclosed by the testimony, does not tend

in any degree to establish such relationship. The judgment in favor of the Standard Oil Company, therefore, was proper.

The evidence in support of plaintiff's claim against the remaining defendants (Swezey and Barnes as individuals and doing business as Swezey's Garage, a partnership, and the Ohio & Pennsylvania Oil & Gasoline Company) is presented by the testimony of several witnesses who were either in or near the Gateway Restaurant and Isaly's storeroom before and at the time of the explosion, a number of village officials, officials of the State Fire Marshal's Office, employees of the local or associated gas companies and of the Standard Oil Company, owners and employees of such remaining defendants, and certain expert witnesses whose answers to extended hypothetical questions were the basis upon which the case was founded.

The village of Andover is located at the intersection of U. S. Route No. 6 and State Route No. 7 and is but a short distance from the eastern boundary line of the state of Ohio. A park or public square is located at this intersection which is the center of the village. Many of the business establishments face this public square. U. S. Route No. 6 (running east and west) as it heads east into the village to the point where it meets the square is called West Main Street and then it proceeds north from the north side of the square where it is called North Main Street. State Route No. 7 runs north and south and that part of it within the village extending north from the north side of the square, which at that point is also U. S. Route No. 6, is North Main Street and the part proceeding south from the south side of the square is called South Main Street. East Main Street runs directly east from the east side of the Public Square. Traffic moving into or through the village must proceed counterclockwise around the square.

The Gateway Restaurant and the Isaly store are located in the same storeroom on the northeast corner of East Main Street and the square. They were in a two-story building about fifty feet wide, fronting on the square with the entrance to the restaurant and store located in the middle of the front of the building. The building was about ninety feet long with the south wall facing the north side of East Main Street. There was a door on this side of the building toward the east end leading into the kitchen from East Main Street. The southerly half of

the storeroom was used by the Gateway Restaurant, the kitchen being situated between the dining room and a storage room along the rear wall of the building. The Isaly store and the restaurant were divided by merchandise cases (but without a partition) with restrooms near the rear, the rear part of the store room being partitioned off for an office. In the kitchen, there was the usual kitchen equipment, including a gas cook stove, gas operated dishwasher and gas operated deep-fat fryer, gas operated hot water heater, walk-in refrigerator, and other kitchen equipment, all of which were in operation at the time of the explosion. Under most of the first floor was a crawl space running from the front to a stone wall ten feet from the rear or east wall of the building. A basement ten feet by fifty feet was thus provided along the east or rear end of the building. A part of the dividing wall between the crawl space and the basement in the northwest corner of the basement and the ground in back of it had been dug out and an oil heated hot air furnace and a sump pump had been installed in the place thus provided. A 275-gallon fuel-oil tank was located in the southeast corner of the basement. The basement also housed compressors for cooling equipment. The only entrance to the basement was by an outside stairway located at the rear and along the south wall of the building with a doorway providing entrance through the outside basement wall. The evidence seems undisputed that there were no vents between the basement, which was under the office and storage space, and the kitchen. On the second floor of the building there were two unoccupied suites. To the north of the Isaly building was a one-story shoe repair shop and directly north of this building was a two-story commercial building designated in the evidence as the Ohio Edison Building. The gasoline station and garage of the Ohio & Pennsylvania Oil & Gasoline Company was situated at the southwest corner of South Main Street and the south side of the square with the gasoline storage tanks near the sidewalk line at the northeast corner of the lot. The Swezey-Barnes gasoline station, garage, and auto sales room faced the west side of the square somewhat south of West Main Street, its gasoline storage tanks being to the south of the station. The highest point in the immediate topography of the land around the square was at its southwest corner between the two gasoline stations so that the flow

of rain water would be to the north from in front of the Swezey station and to the east from in front of the Ohio & Pennsylvania Oil & Gasoline station.

There were two sewer systems, one sanitary and one for storm water. The sanitary sewer, a gravity system with flush tanks at the beginning of its several branches, has a branch beginning on West Main Street running to the square, then around the square to the south where it meets the branch running north on South Main Street, then around to East Main Street where it proceeds eastward to the disposal plant at the eastern limits of the village. This is the branch of the sanitary sewer serving both gasoline stations and is also the sanitary sewer to which the restaurant building is connected.

The northerly branch of the sanitary sewer begins on the west side of the square just north of West Main Street and from there to North Main Street, the gravity flow running north for a considerable distance and then through the fields in a southeasterly direction connecting with the branch in East Main Street. At this point its level is twenty feet below that of the sanitary sewer at the manhole at the beginning of East Main Street and the square (the site of the Isaly store). This last described branch is the branch of the sanitary sewer to which the Ohio Edison Building is connected and is separate and apart from and has no connection with that part of the sewer servicing the Gateway Restaurant except as just indicated, a considerable distance to the east. These sewers were installed in 1911 or 1912 and have not since been disturbed. They are situated in the center of the streets through which they run and the streets are now paved with black top, which in some cases has been laid so as to cover up the pick holes in the manhole covers.

The storm sewers as constructed at or near the square (clearly a gravity system) all flow in a northerly direction. The branch that is shown as the one servicing the Swezey station proceeds eastward on West Main Street almost to the square, then runs diagonally across the public square to North Main Street, and then northward on North Main Street. This branch is not connected with and is a considerable distance away from the Ohio & Pennsylvania Oil & Gasoline Company gasoline station and the Gateway Restaurant. Another branch of the storm

sewer which might be called the main branch, it being 24 inches in diameter, runs in a northerly direction to which is connected a branch coming from South Main Street, which connection is two or three hundred feet south of the square and east of South Main Street ("in a field") some 200 or more feet from the east side of South Main Street. This branch crosses East Main Street east of and at least fifteen feet to the rear of the Gateway Restaurant. In addition, there is a storm sewer connection from the Ohio & Pennsylvania Oil & Gasoline station running eastward across South Main Street to the branch just described. The evidence shows, however, that this connection was completely clogged with tree roots and dirt, so that no water could reach the main storm sewer through it and when dug up shortly after August 10, 1955, no odor of gasoline was detected therein. This was the only connection of the Ohio & Pennsylvania Oil & Gasoline station to the storm sewer.

Beginning about six o'clock of the afternoon of August 10, 1955, and lasting until a few minutes before seven, there was a very heavy rain and lightning storm in and about the village of Andover. It was described by a witness as one of the heaviest rain and lightning storms experienced in the village for a number of years. After the beginning of the storm, the streets around the square were in some places flooded curb deep. By seven o'clock, however, the rain had subsided to a slow drizzle.

Patrons in the restaurant for almost an hour before the explosion noticed an unusual odor in the restaurant. One witness said it was like refrigerator gas or more like ammonia and that she thought there was a peculiar smoke in the cooler. Another witness inquired of a friend whether she smelled gas. At least six witnesses noticed the unusual smell but none could clearly identify what it was, but they all said the odor was not that of gasoline vapors. One witness testified that she felt a cold draft coming out of a vent in the front of the restaurant but that when she went into the storeroom there was hot air coming out of the vent under the ice cream cooler and that the odor "was getting my throat." One of the owners of the restaurant who had noticed the unusual odor testified that she went to investigate but did not do so because as she looked out of the kitchen door she found the water pouring down the basement stairs, and as she testified, she tried to build a dam around the outside stair-

way to the basement and to clear a storm drain in the alley to the east of the rear of the building in an effort to protect the condenser machinery. She said the water in the basement came over her ankles while standing on the stairway.

Shortly after seven o'clock p. m., there was a violent explosion which witnesses who were outside the building said pushed the side walls out and caused the upper part of the building to fall to the ground floor. Some of those on the inside were blown into East Main Street and one woman was blown under the floor into the crawl space. A small fire was noticed in or near the kitchen shortly after the explosion which developed rapidly, and the building, with other buildings around it, was completely destroyed by fire. The plaintiff was one of the patrons in the restaurant who was blown into the street and at first was pinned under some of the debris.

It is asserted by the plaintiff in his claims of negligence that the explosion was caused by gasoline which had been negligently permitted to leak from the storage tanks and underground pipes that serviced the pumps of the gasoline stations and which had then found its way through one of the several routes into the basement of the restaurant, that it vaporized there, and that it exploded either in the basement or in the kitchen, causing plaintiff's injuries. The routes suggested, that the gasoline traveled from the stations to the restaurant, are along or in the sewers, tile telephone line conduits, water or gas lines, or washed through the ground. The distance from the Ohio & Pennsylvania Oil & Gasoline station to the restaurant was about 350 to 400 feet, and from the Swezey station between 450 to 500 feet. The ground in and around and in the vicinity of the gasoline stations and the public square is yellow clay to a depth of about four feet where it changes to blue clay.

The evidence alleged to support the negligent escape of gasoline from the Swezey station was presented under two claims. The first was developed by the testimony of an employee of the State Fire Marshal's Office. It is claimed that he checked the station's records on the receipt and sale of regular gasoline and found that, over a period of forty-five days, on the date of the check (a few days after the explosion) 642 gallons of gasoline, shown by the records to have been received, were unaccounted for. It is claimed also that during a period

of two hours of a day subsequent to checking the records, a pinpoint test was made and seven gallons of gasoline were unaccounted for, the test being made by a Standard Oil Company employee who had been sent to the station after the report of the alleged inventory shortage.

As to the first of these claims, the report of the investigator for the State Fire Marshal was as follows:

"I checked the inventory records back for 45 days with Mr. Swezey, the manager of the station, and according to his records, we found a shortage of 642 gallons. I notified E. L. Arnold, div. mgr. at Youngstown, and he sent up E. Hopper, Sr., examiner from Columbus, Ohio, D. D. Wortman, automotive engineer and Otto C. Haier, mgr. of safety department, Clev. O. They checked the records, put (on) a pressure test, also a pinpoint test and found no loss of gasoline. Mr. Hopper said he would send a copy of his report to our Columbus office. Mr Swezey, mgr. of the station, still claims he was short 642 gal according to his records. I will check this station again before I close my investigation in Andover."

Any claim that Mr. Swezey's protestations were evidence that there was a leak in his four thousand gallon tank is not supported by the record. Swezey's claim was that he had not received all the gasoline shown as delivered on his books. He later, upon a continuation of the investigation of his records, found that the book shortage was occasioned by what is known as a "cross dump" and not resulting from a leak in the storage tank. The testimony given after the partial report recorded by the Fire Marshal as received in evidence constituted a part of that transaction involving the records and was not an explanation creating a jury question. As read into the record from depositions taken by plaintiff, the record shows the following:

"Q. And then the next question was asked you that Mr. Sindell did not read also: 'All right, what brought up your claim?'

"And you answered:

" 'My claim of shortage was found to be due to the fact that the transport driver, in coming in with transport loads, it comes in large quantities and in dumping the compartments, he could not dump the gas into the tank; therefore it was dumped into the other tank. Where we ran a shortage of 642 gallons in

one tank, we ran, in checking out the records, we ran an overage of six hundred and some gallons in the other tank which was greater than our shortage. We ran an average in the other tanks.' "

On the same subject, the record shows:

"Q. And I'll ask you, please, Mr. Swezey, to explain to the ladies and gentlemen of the jury if that was indeed the fact that the purported shortage of 642 gallons was, in fact, merely a cross dump, that that gasoline was put in another tank? A. Yes, sir. The x-tane tank would not hold all the gasoline that was brought out on the transport and upon checking the records, we found that the x-tane tank, the gasoline that on the original check we thought had gone into the x-tane tank would not hold it and it was in with the higher price gasoline, or the Boron tank, and those cross dumps varied from, well a few gallons to as high as 200 gallons because we brought a transport load at a time from Cleveland it was billed out as a transport load. We had to guess at the amount of gasoline we could take when we called them the day before. When our tanks get down low, we figure what would be the maximum amount we could handle and if the transport came out and it wouldn't all go in the x-tane tank, when it got full, it was turned as cross dump into the other tank and that's exactly what happened in this case."

The report of the State Fire Marshal, introduced by the plaintiff, quoted above, and depended on by the plaintiff as evidencing a leak in the Swezey and Barnes 4,000-gallon storage tank because of an inventory discrepancy in the amount of gasoline received and sold also has within its terms the statement that "they check the records, put on a pressure test, and found no loss of gasoline." This part of the statement was not included in the hypothetical question which included the first part of the report. Another witness called for cross-examination testified that tests were made, the results of which sustained the fact that the 4,000-gallon tank did not leak, and there is no testimony in the record to the contrary.

The second claim of the plaintiff said to tend to establish that gasoline leaked from the 4,000-gallon tank is presented by the testimony of a Standard Oil Company employee who had been sent to inventory the station because of the alleged record shortage of 642 gallons just considered. A pinpoint test was

made of the gasoline in the 4,000-gallon tank as well as that in the 3,000-gallon tank. It is claimed that this test showed a loss of seven gallons in the larger tank occurring over a period of less than two hours. The witness stated that upon arriving in Andover August 17, 1955, he made a pinpoint measurement of the gasoline in the tanks. There were between two and three thousand gallons in the x-tane tank (the 4,000-gallon tank). After taking the first step in the pinpoint test, the accuracy of the pump meters was tested by the use of a five gallon measuring can that had been approved by the Bureau of Standards. This test is made by drawing off five gallons of gasoline into the test can and then comparing the amount metered on the pump with the amount pumped into the test can. The witness testified that one x-tane pump "threw over four cubic inches" while the second x-tane pump was short 8 cubic inches and on the second test it was four cubic inches short. After these tests were completed, it then being between 4:10 or 4:45, the second pinpoint level was taken in the tanks which showed that the "supreme tank, having no sales after the first measurement, stayed even. * * * On the x-tane there was about a 7-gallon difference." Between the measurements there had been sales of 30 gallons, and upon the second measurement there was a showing of 37 gallons missing. The witness, when asked "Did you make it again?" answered "No, we figured that was close enough." The record then shows:

"Q. This is in the one hour interval that there seemed to be a 7-gallon difference which was not accounted for by sales in that hour? A. That's right, but that could be caused by the ripple on the gasoline or on account of the tank being so close to the highway."

He testified further that he could see the gasoline level in the tank and that it was not steady.

It must be remembered that this measurement was made after pouring 15 or 20 gallons or perhaps more of the gasoline pumped to make the meter tests back into the tank from the five-gallon measuring can used in testing the pump meters. The measurements of this 4,000-gallon tank were five feet four inches in diameter and 24 feet long and at the time of the tests it was between one-half to three-quarters full. The assumption of the witness that a variance of seven gallons was close enough as

not to require a second measurement to establish the fact that the tank did not leak is supported by mathematical calculation. If the tank were half full, the subtracting or loss of seven gallons of gasoline would not change the level of the surface of the gasoline more than thirteen hundredths of an inch. Certainly, the conclusion of the witness was reasonable and there is no evidence to the contrary. One other calculation should be made as to the claims of the plaintiff seeking to establish the negligent escape of gasoline from the 4,000-gallon x-tane tank of the Swezey and Barnes service station. If the test claiming to show an actual loss of seven gallons in (at the maximum) two hours were assumed to be correct, the loss per day would be 84 gallons, and for ten days would amount to 840 gallons, and for 45 days (which was the period over which the inventory shortage is said to have developed) would be 3,780 gallons. If this were a fact, the alleged loss claimed to have been shown by the inventory would be without any foundation. Moreover, if there were any proof of a loss by leakage because of an inventory shortage over a period of 45 days of 642 gallons of gasoline, then there could not have been a leakage of gasoline at the rate of 7 gallons in two hours over the period of the inventory examination. One of these claims completely negates the other. The three- and four-thousand gallon tanks were installed new shortly after 1945 and were buried 8 feet deep. The soil consisted of blue clay at the bottom of the pit where the installation was made, turning to yellow clay four or five feet from the surface. The place of installation was about forty feet from the station and well below the sanitary sewer connection for the station. There is, therefore, no credible evidence that gasoline leaked from the tanks of the Swezey and Barnes station.

The claim of loss of gasoline by leakage from the underground pipes of the Ohio & Pennsylvania Oil & Gasoline station is concerned with a rust hole that developed in the suction line of the number one pump. There is no evidence that there was leakage from the underground tanks of this gasoline service station. In fact, the evidence was clearly to the contrary. The tanks and pipe lines from and through which gasoline was dispersed to customers at this service station were installed in 1930. The pumps and service lines used at the time of the ex-

plosion to deliver gasoline to customers' automobiles were operated on the suction principle. By this method the gasoline line from the storage tank to the pump had to be full of gasoline and if this were not so, the pump would have to be primed in order to work. The method used to keep the suction line full when the system was installed was provided by a "foot valve" at the end of the suction line and placed on the end of the suction line at or near the bottom of the storage tank. This valve was so constructed that when the gasoline pump was operating, it would suck gasoline through the valve and suction pipe to the point where gasoline was being delivered through a service hose. But when the pump was stopped, the valve would close and the gasoline in the suction line could not then return to the storage tank and thus would keep the pump primed and ready for service. The testimony of an officer of the Ohio & Pennsylvania Oil & Gasoline Company, relied on in part and asserted as a fact by the plaintiff in his (appellant's) brief and stated as a fact as to a part of one of plaintiff's hypothetical questions, was to the effect that this foot valve began to malfunction so that the pumps servicing regular gasoline began to lose prime, beginning in or about 1950 to 1952. The officer testified that check valves were then placed in the suction line under the pumps and that thereafter the pumps operated properly. The function of a check valve placed under the pump is the same as that of the "foot valve" when placed at the intake end of the suction line. When the pump is operating, it permits gasoline to pass from the storage tank through the suction line into whatever receptacle is being filled. When the pump is stopped, the check valve not only holds the gasoline that is between it and the dispensing nozzle, but also, if there is no means by which air can get into the suction line, under common principles of physics, the gasoline in the suction line cannot drain back into the storage tank, thus keeping the pump ready for further service without priming. The evidence seems to support the fact that check valves are regular equipment in gasoline pumps and were, in fact, a part of the Ohio & Pennsylvania pumps so that the valves put in were, in fact, replacements. There is no evidence disputing the proper functioning of the pumps servicing regular gasoline after the check valves were installed or reinstalled until "several weeks" after the explosion when one

of the pumps suddenly stopped pumping gasoline while being used to service a customer.

After the explosion and on or about August 15, 1955, as directed by an employee investigator of the State Fire Marshal's office, an air test of the pipes and storage tanks of the Ohio & Pennsylvania station was made by an employee of The Wolf's Head Oil Refining Company of Oil City, Pennsylvania, the results of the test being that there were no leaks in the station's underground gasoline storage tanks and dispensing pipes and equipment. Wolf's Head was undoubtedly called to make the test because it supplied Ohio & Pennsylvania with its petroleum products.

When the number one pump of the Ohio & Pennsylvania station stopped pumping gasoline while it was being used to service the automobile of a customer, it was thereafter removed from the "stem" and set to one side but at no time before its removal was it used to pump gasoline after it stopped as just indicated. When the State Fire Marshal investigated the station on his visit of October 25 and 26, 1955, he attempted what he called a gravity or sight glass test which he said was made because he found the number one pump disconnected. Upon filling the regular gasoline underground storage tank full, the sight glass was then fixed to the fill pipe and the vent pipe extended to the height of the sight glass. This witness then testified:

"Well, the tank got up to where we, by sound, could hear it gurgling down through the sight glass and the sight glass would fill up and then would quickly drain down. I attributed that, of course, to air settling out of the tank at first but as we continued to fill the sight glass and it continued to drain down, I could not feel that it was the sight glass alone and then we started to check for what was happening and Mr. Ricker took a flashlight and went to the island where the pump had been removed and called back * * *." (Some gasoline was then observed in the field tile through which the suction line projected.)

This witness also testified:

"Our next step was to prevent any leakage of gasoline into the surrounding area, and we accomplished that by turning the pump on No. 1 island on and using the discharge hose from the pump to pump the gasoline out of the piping and as we turned

the pump on, the gasoline in the field tile started going down. We kept on pumping until we had lowered the level of the tank, approximately 150 gallons and then decided to cease operations for the night as it was 10 p. m.''

The next morning a piece of the suction pipe about twenty inches long and extending horizontally from the elbow attached to the vertical part of the suction line, which part of the suction line extended up through the ''field tile,'' was uncovered by digging down about two feet, the pipe being 18″ underground. The Fire Marshal, in testifying about this, said:

''Well, a rather aged gentleman appeared on the scene and I had a few qualms about his ability to even wield the pick, but am happy to say I was very surprised because he did a very good job. * * *

''Well, we got down to the pipe and unearthed the pipe where it went under the service island and cleaned the earth out around it, we found the pipe had a hole in it. * * *''

He was later asked:

''What was the nature of the soil surrounding the pipe before it was removed, sir, as you removed it?''

He then stated:

''It was a kind of blue clay soil that surrounded the pipe in which it was buried.''

On cross-examination, this witness, the State Fire Marshal, said:

''If it were a fact—If I knew it to be a fact that if the line had been tested by someone who rendered a report that indicated it had been tested, then it doesn't seem logical that it could have been leaking; on the other hand, the corrosion present is of such nature that it indicates that the line could not have been tested and failed to show a leak with the tremendous amount of corrosion evident.''

He was then asked:

''Well, but if you knew that the line had been tested [pressure tested], your own testimony was that those tests very often cause holes to exist that didn't exist before, such a test could, therefore, have caused a hole to come into existence where it hadn't been there before, couldn't it?

And he answered:

''It could have.''

There is no question that a pressure test was made on this tank five days after the explosion, as shown by plaintiff's evidence, which test showed no loss of gasoline.

The record contains the testimony of three witnesses called by the plaintiff, as to the removal of the piece of the suction pipe in which a hole was exposed after the dirt and rust had been scraped away, including that of the Fire Marshal who directed the operation, and a part of whose testimony has been quoted above. His testimony was that the pipe was eighteen inches underground and was buried in blue clay, the hole being on the top of the pipe and by measurement was seven inches from the elbow by which the suction pipe was connected to the vertical section of the suction line coming through the field tile to the point where it was attached to the pump before the pump was removed. He said that a further test showed no loss of gasoline when a new piece of pipe was replaced in the suction line.

The helper who was called upon to dig the hole around the suction pipe, referred to by the Fire Marshal as above quoted, said that the dirt around the suction pipe was yellow clay. The bill of exceptions indicates the questions put to this witness and his answers as follows:

"Q. Did you do any digging [in connection with the Fire Marshal's 'gravity test' on October 25 and 26, at the O. & P. station]? A. I done the diggin, yes.

"* * *

"Q. Now, what did you do with respect to the pipe that was near that pump? A. Well we—this one where that connection was, I don't know whether we hit it with a pick or what it was. It was just damp around the connection and that's the one we took off.

"Q. And you say it was damp. What was it damp with, could you tell? A. Well, that was gas from gas running in [gasoline]."

The witness then said he helped to take the pipe out, that they had two wrenches, that the pipe was not broken, that it was covered with yellow clay, that he got a new pipe and after it was put back in place, he covered the hole. On cross-examination, the record states:

"Q. Now you told me that you actually scraped this piece

of pipe with a hoop? A. We scraped it with a piece of tin to get the dirt off, see. We didn't get the rust but we got the dirt, so the boys could take a picture of it.

"* * *

"Q. You told me it was a piece of metal band that goes around the bottom of barrels? A. That's correct, because that has got metal in it for cleaning pipe.

"Q. And as you pulled it, you scraped along didn't you? A. Yes.

"* * *

"Q. Now, look at this exhibit here please. You didn't see a hole like that—[indicating]? A. Never did."

The exhibit shown the witness was plaintiff's exhibit 47, which was the piece of pipe which had been taken out of this part of the suction line. It was about twenty inches long and a short piece, about three or four inches long, had been cut off with a saw. The unsawed end of this small piece was threaded as was the unsawed end of the longer piece. About nine inches from the threaded end of the longer piece, as the exhibit now appears, is a hole one and one-eighth inches long and a little over one-half inch wide. The hole undoubtedly was the result of corrosion. When compared with the enlarged photograph of the piece of pipe taken after its removal, which is in evidence, the hole in the exhibit is now noticeably larger.

The record also states:

"Q. Did you see any hole in the pipe at all? A. No, sir, just that leak in that corner [indicating].

"Q. Was this right up close, this leak in the corner, was this—? A. It comes down from the pump and attaches right there [indicating].

"Q. Right at the bottom? A. That's when they connect, right there [indicating].

"Q. Is there an elbow right there [indicating]? A. An elbow.

"Q. Do you know anything about this little piece that is cut off here [indicating]? A. No."

And on redirect examination, this witness stated:

"Q. You don't have any recollection of breaking that pipe yourself? A. No, sir.

"Q. With the two wrenches? A. That would be a new one to me.

"Q. You don't remember anything about that? A. I just held one end with the wrench and he did the rest."

This witness clearly stated that the dampness from gasoline as he found it in the excavation was around the elbow in the field tile and not at the point where the hole was subsequently found, and this evidence is nowhere contradicted.

The testimony of the president of the Ohio & Pennsylvania Oil & Gasoline Company, who was called for cross-examination (the third witness above referred to) dealing with the removal of the piece of suction line from the elbow where the pipe turns from its horizontal to a vertical position through a field tile to the pump, was, in part, as shown by the record, as follows:

"Q. But you saw Marshall Scott doing a sight test on that before the pipe came out, didn't you? A. Yes.

"Q. You saw the gasoline disappear right out of the sight glass, didn't you? A. It didn't just disappear out of the sight glass that fast.

"Q. Well, it disappeared? A. It went down slowly."
" * * *

"Q. How long did it take for that to drop down the height of that sight glass, Mr. French? A. I would say about 15 or 20 minutes.

"Q. And you saw the gasoline gurgling up underneath— A. It didn't gurgle.

"Q. You saw the gasoline? A. There was some gasoline in there, but it didn't gurgle.

"Q. Isn't that where it came out? A. It came up in the center of the island. That's where we had been working.

"Q. And you saw the gasoline in the sight glass test before it came, before the pipe came out of the ground, didn't you? A. Yes, I saw that before.

"Q. And it was after they took the pipe out that you saw the hole in that pipe, isn't that correct? A. That's correct.
" * * *

"Q. Let's take this pipe now, if we can find it here. Hold it. Now, is that substantially the way the pipe looked on the 26th of October when the Fire Marshal took it out of the ground? A. I would say the hole is larger than it was then.

"Q. It's larger now? A. It is larger now.

"Q. How much larger? A. I would say it was about one-quarter that size when he took it out of the ground.

"*  *  *

"Q. Was that center piece in there the day you saw it, the 26th of October? A. The day I saw it, there was just a small hole here on this end.

' "Q. Did you know Marshall Scott took some photographs? A. Yes.

"*  *  *

"Q. All right. Those pictures show that hole, don't they, just the way it was the day it was taken out, October 26th? A. Those pictures—

"Q. Yes. A. —were taken after he had the pipe out. When I first saw the hole, it wasn't that big."

"*  *  *

"Q. How did you know pictures were taken the same afternoon? A. Why, as I remember it, he was going to take some pictures of it after he took it in the garage and brought it back out. I think he took it in and washed it off. I may be wrong.

"Q. Did he discuss the pipe with you? A. Some.

"Q. Did he have the pipe in his hand when he talked to you? A. I don't remember.

"*  *  *

"Q. Do you know whether you had a wrench in your hand? A. I don't remember that, no.

"Q. Well, how did you help him? A. I think I helped Scott take the pipe out.

"Q. At any rate, you were right there helping to remove it, watched it being removed, and as it came up out of the ground, did you then see the hole in the pipe as it was turned around towards you? A. Well, as I remember it, there was some rust on there and Scott flicked the rust off and then we saw the hole in the pipe.

"Q. As you remember it? How much rust was on there when Scott did that? Was it fully covered or just a part of it? A. It was covered all over with rust.

"Q. In this particular area, you say that the hole had rust on it? A. There was flecks of rust.

"Q. Flecks of rust? You mean that the hole was fully covered with a rust cover or that there were flecks of rust around the hole? What do you mean? A. I think it was covered all the way over with flecks of rust, as I remember.

"Q. But you are not sure of it? A. That is the way I remember.

"Q. You said you think— A. As I remember it, that is the way. It was covered all over with flakes of rust."

At a subsequent part of the cross-examination, this witness testified that when the piece of pipe was taken out of the hole it was covered with clay and rust and corrosion and that he did not then see a hole in the pipe and that Marshall Scott then took the piece of pipe in the garage and when he brought it back in five or ten minutes:

"I think he had cleaned some of the rust and scale off of the pipe inside the garage."

And when asked to describe how the hole appeared to him, he stated:

"It appeared to me to be about the size of a pencil, as I remember."

From the foregoing evidence, and that of the Fire Marshal, it is clear that there were no leaks in any of the tanks or underground equipment of the Ohio & Pennsylvania station, except for that occasioned by the hole that was discovered on October 26th, after the pressure test of August 15th (forty-five days after the explosion), the hole being on the top of the suction line serving the regular gasoline pump on the underground island.

There was no outward pressure exerted on this suction line from within while functioning as intended except for the weight of the gasoline in the line above the level of the top of that part of the suction line lying in a horizontal position, that is the part of the pipe in which the hole was discovered. Whatever slight pressure that might be exerted while the pump was not operating would be neutralized by the vacuum created by the check valve. As long as the vacuum was maintained, no gasoline could leak out of the pipe. If the vacuum were released by a hole in the suction pipe because of the weight of the gasoline above the level of that in the storage tank due to atmospheric pressure, the release of the vacuum by air entering the pipe though the hole would cause the gasoline in the suction line to return to the storage tank. The air coming in the hole would prevent gasoline leakage through the hole. The only gasoline above the hole in all events would be that in the vertical part of

the suction line above the elbow, which the evidence shows could not have exceeded a quart. These facts are according to the natural laws of physics of which the trial court was bound to take judicial notice. If the check valve was not sufficiently tight to create a vacuum and did not hold gasoline in the suction line and the foot valve was ineffective for that purpose, then the gasoline would return to the tank and the pump would be inoperative.

In giving consideration to the time when the hole developed and the probable size of the hole the day of the explosion, the determination of this question is dependent upon the testimony of an expert witness in answer to hypothetical questions describing the hole as exposed two and one-half months after August 10, 1955. The facts stated in the hypothetical question were that a part of the suction line pipe (a piece of iron pipe one-and one-half inches in diameter which, before a portion thereof two and one-half inches in length was cut off on the end farthest from the pump, was twenty-four and one-half inches long and was threaded on both ends) which served a gasoline pump was removed on the 27th day after the explosion; that when this part of the suction line was removed, a hole in the pipe was disclosed as shown by plaintiff's exhibits 50-C-1 and 50-F-1; that the gasoline service station was located at Andover, Ohio; that the pipe lay in soil said by one witness to be blue clay and by another witness to be yellow clay; that the material above the clay was cinder-like ashes about twelve inches in depth or as coarse grey slag about six inches in depth and above this was asphalt; that the pipe lay in the ground horizontally; that there was no seal between the concrete pump island through which a field tile had been installed to accommodate the service pipes; that a part of the suction line proceeded perpendicularly from the pump through the field tile and there connected to the pipe in question, as shown by plaintiff's exhibit 50-F-1; and that the pipe was put into the ground in 1930 and had not since then been removed, disturbed or repaired until October 26, 1955.

The witness testified that it was his opinion that there was no change in the pipe between the date of the explosion (August 10, 1955) and the date that the pipe was removed.

Facts were then added to the hypothetical question to the effect that in 1950 and 1952 the operators of the station noticed

that the pump was losing its prime and a check valve was installed underneath the pump, it being a one-way valve only, permitting the gasoline to go up and not down and holding the gasoline in the pump above the check valve, and that after the check valve was put in the pump functioned. The witness was then asked to measure the hole as shown in the photographs for the purpose of determining the actual size of the hole when the pipe was taken out of the ground. He was then asked if he had an opinion as to the limit of time, minimum and maximum, as to when the hole of some size first appeared in the pipe prior to the removal from the ground. After explaining the process, the witness said:

"I would estimate the limits as a half to eleven years."

The witness testified further that the hole was not the result of an air pressure test to which the pipe and the gasoline storage tank were subjected on August 15, 1955.

The question included the fact that the pipes serving all the tanks at the Ohio & Pennsylvania Oil & Gasoline station were installed in 1930.

The only evidence of any failure of these pipes, there being at least from one to one hundred fifty feet of pipe, all buried in yellow clay, is that of about six inches of the twenty-four inch piece just described, which was subject to severe corrosion, and which piece is described by this expert witness as follows:

"A. There are roughly where I can demark this length of pipe into three areas with respect to the extent of corrosive attack.

"This area here, roughly 6 inches in length—
"* * *

"Then a center section about 7 or so inches in length indicating a very severe corrosive attack, and then another section about 7 inches in length, indicating a minor attack."

Elsewhere in his testimony the witness described the first six inches as having been subject to moderate corrosive attack.

The witness based his opinion on the shortest length of time it took for a pinpoint hole to enlarge to a three-eighth inch hole upon an assumed soil corrosion rate of eleven thousandths of an inch, and stated, that in his opinion this was "the highest corrosion rate in soils that I have known of in Ohio." There is no evidence of this fact in the record, nor did the hypothetical

question contain any reference to the soil corrosion rate of the soil in which this pipe had been buried for 25 years. The witness said:

"We take .0065 thousandths and divide that by 11 thousandths, that's X over K, and it comes out about .6 years, a little more than a half a year; that's about seven months.

"But this would be the shortest time, in my opinion, in which this hole could go from a pinhole to a size 3/8ths of an inch in length."

The longest period of time suggested by this expert was calculated on an entirely different basis. He started with a sound pipe that had been buried in the ground for 25 years. He assumed the maximum soil corrosion rate of .011 inches per year with the thickness of the pipe of .155 inches and that dividing .011 into .155 would give 14 years for the pinhole to develop. He then deducted the period of time that it took to corrode through to make a pinhole, which was fourteen years, from the period of time the pipe had been buried, which left eleven years as the amount of time it took for the hole to become the size it was when it was removed from the ground. The last figure is based clearly on speculation without any relative soil corrosion figure. The witness, when asked how long the hole was developing before the pipe was removed, based on a less rapid corrosion rate, said:

"A. The average rates, we can assume an average rate of about .006 per year, which would be more in keeping with Ohio soils, plus it would be more in keeping with that we have a thickness of pipe here .155 inches in thickness, and the time it was in the ground is of the order of 20, 25 years, just of that order of magnitude.

"The average rate is .006 inches per year, in that order, so that now, taking this as an average rate and knowing this thickness, X, indicated here, which we calculate as .0065, it would be a little over one year to form a hole of that size, assuming only corrosive attack from the soil, soil corrosion."

Thereafter, the bill of exceptions reads:

"Q. Well, isn't it a fact, sir, if instead of the corrosion proceeding in a straight line, as you have drawn it on your diagram there, the corrosion of this pipe proceeded in a dished-out fashion, as I have drawn it on this particular diagram so that

there was an area of 3/8 of an inch approximately where the metal was of approximately a uniform thickness, then isn't it probable under those circumstances that the corrosion would progress through more than one hole at the same time? A. Probable, I don't know the probability. I would want to know actually to measure the profile across the hole, which would be helpful in answering that.

"Q. And you haven't done that, have you? A. No, sir.

"Q. And you say— A. I have just come up with an estimated probable figure.

"Q. I see. A. I set what I think, in my opinion, are limits, and arrived at a probable answer. I am not stating anything with certainty here, no."

The evidence shows that there are many physical facts which must be taken into consideration in determining the time in which an iron pipe buried in soil will corrode or that by the phenomenon of corrosion, the time in which it will proceed to the point that will cause a hole to develop in the pipe. The fact situations involve the physical analysis or nature of the pipe, whether the corrosion started in a single pinhole or from multiple pinholes in the same area, the condition of the soil, whether the pipe was subject to stray electrical current and whether cinders came in direct contact with the pipe and the like. Reading from a circular of the United States Bureau of Standards, under the title, "Factors that affect corrosion underground:"

"These factors are grouped under four headings: (1) Aeration, (2) Electrolyte, (3) Electrical Factors, and (4) Miscellaneous."

There is no evidence tending to establish any of these factors other than the fact that the pipe was buried in clay and that when it was unearthed two and one-half months after August 10, 1955, there was a hole in the pipe.

A fair appraisal of the evidence by which it is attempted to show the length of time the hole in the suction line, due to corrosion, had existed is so speculative that the best that can be said for it is that the only way the jury could have come to a conclusion on the matter would be by guesswork. This conclusion is clearly supported by the fact that the closest the expert could come to answering the question of how long it took the hole, said to be three-eighths of an inch wide when removed from the

ground, to develop from the time it was just a pinhole, was from seven months to eleven years. It should also be noted that the witness testified that conditions might change after the pipe was buried to cause or accelerate corrosion. Furthermore, out of about 150 feet of suction pipe all buried in clay and installed in building this station in 1930, only one short piece seven inches long seems to have suffered from severe corrosion while a seven inch piece contiguous thereto was scarcely affected. This would logically suggest a cause occurring subsequent to its installation as suggested by the expert. There is no evidence upon which reasonable minds might agree that even remotely suggests when the hole developed.

One other factor must be considered with regard to any assumed leakage from the hole found in the suction line just considered. The evidence is uncontradicted that the soil around the Ohio & Pennsylvania gasoline station is clay. The pipe, with the hole developed from corrosion, was taken out of clay soil. One witness described it as blue clay while others said it was yellow clay. In installing the foundation for a sign near the location of the storage tanks, the hole dug there revealed yellow clay below the flower garden top soil, and when, during this trial, the president of the Ohio & Pennsylvania Oil & Gasoline Company dug up the ground in and about the pump islands to check the location of the suction lines for the various pumps, he found yellow clay at every location where the digging took place. The evidence is uncontradicted that in and about both of these gasoline stations, and in the surrounding territory, the soil is yellow clay down to three or four feet where it turns to blue clay. The underground sewer pipes at the Ohio & Pennsylvania station are at least 20 to 30 feet south and east of the suction lines from the point where they run from the pump islands to the storage tanks which tanks are located at the northeast corner of the lot and buried 92 inches from the surface. The tanks are at least 10 to 15 feet from the storm sewer catch basin in the street at the northwest corner of South Main Street with the square, and the sanitary sewer, buried eight feet in the ground, is 30 to 40 feet distant from the tanks and from 50 to 75 feet from the place where the pipe with the hole was removed.

The hydraulic expert testified that the permeability of clay soil by gasoline was very low. The record states:

"Q. So, if the hydraulic gradient then is one per cent, the actual rate of travel would be only one per cent, or one and one-quarter inch per year, is that right? A. That's right. You are not going to get much flow through clay.

"Q. Well, if the hydraulic gradient were straight down, that would be 100 per cent hydraulic gradient, or what would it be? No, no, when it's 45 degrees.

"Q. Well, when it's 45 degrees? A. That's right.

"Q. That would be 100 foot of drop for every foot of drop, is that right? A. That's right.

"Q. And it would be exactly one and one-quarter inches per year, is that right? A. Right.

"Q. And this is through the clay soil, is that correct? A. Through clay soil."

Just after the piece of suction line pipe was removed at the direction of the State Fire Marshal on October 26, 1955, he put a pint of oil of wintergreen in the hole before it was filled for the stated purpose of checking the direction of underground flow. The sewers and catchbasins were checked every day for a month thereafter without any results.

We find, upon considering the evidence submitted by the plaintiff in support of his claims of negligence against the defendant Ohio & Pennsylvania, in its most favorable light for the plaintiff, that the court did not err in directing a judgment for said defendant at the end of the plaintiff's case.

Consideration will now be given to the probative value of the testimony of the plaintiff's primary expert witness upon whom he relied to show that the alleged negligence of the defendants was the proximate cause of the injuries sustained by him as a result of the explosion in the Gateway Restaurant August 10, 1955. Some criticism is directed at the basic hypothetical question as presented to the witness for quoting conflicting testimony or stating uncertain fact conclusions. This criticism is justified for the reason that there are many statements of what one witness said, as opposed to different statements or diversified views of other witnesses dealing with the same matter. Such statements are not properly a part or rightly included in the statement of facts in a hypothetical question. The content of a hypothetical question should adhere to a statement of the facts upon which the expert is prepared to give his

opinion which is to be considered by the jury only if it finds that the facts upon which it is based have been properly established by the evidence. Statements of questions in controversy would only tend to confuse the jury. The expert cannot encroach upon the functions of the jury in determining issues of fact from divergent statements of evidence dealing with or tending to prove or disprove an essential fact situation.

Proceeding to examine further the testimony of this witness, the record shows that prior to being employed by the plaintiff, he was employed by the defendant Andover Gas Company to examine into the cause of the explosion of August 10, 1955, at Andover, Ohio. The witness spent one day in inspection of the scene and talking to witnesses at the gas company's request, and thereafter a written report was made. After this case was instituted, upon the settlement of plaintiff's claim against the gas company as asserted in the third amended petition, such defendant was then dismissed from the case on a covenant not to sue entered into as shown by the record. This witness was then released by the gas company and was employed by the plaintiff as an expert witness. The deposition of this expert witness was taken three or four months before this trial was commenced, at which time, after telling of the statements of Mrs. Cullen and Mr. Dotta, made after the explosion, in an investigation which took place at that time, he testified as follows:

"Q. Well, let's refer to your report, then, and see what you said there. Referring to the top paragraph in the second page, in the middle, which is Mrs. Cullen, 'She found odors which she described as of the ammonia type around the ice cream refrigerator on the front of the store.' Do you remember that? A. Yes.

"Q. Then going down to Mr. Dotta, 'He quoted his wife as saying that she was talking with Mrs. Mock about the strong gas odors which he also described as being of the ammonia type and not of the heating type.' Do you remember that? A. Yes, at least I did recall it in that report.

"Q. Now, at the time you were there making your investigation, you made no effort whatever, however, to run down or track down the source of this peculiar odor that Mrs. Cullen and Mr. Dotta had referred to, did you? A. No. Of course, an

explosion destroys any such evidence. You are not going to find anything after the explosion.

"Q. You wouldn't expect to find any trace there after the explosion there, is that right? A. No, sir.

"* * *

"Q. The question at the bottom of the page was, 'Now, based upon the observations that you made at that time and the information that you collected as you have related it to us here today, do you have an opinion as to what, if anything, was the cause of this explosion?' And your answer was, 'I stated no such opinion in this report. I stated a negative conclusion.' That was your answer to that question, wasn't it? A. That's right.

"Q. All right, and the next question, then, was 'Well it was your conclusion at that time that you couldn't tell what had caused it, is that correct?' And your answer was, 'It was my conclusion'—let me quote—'I am convinced that the more detailed investigations'—Then you apologize. You apologized and said, 'Oh, I stated here—pardon me—'

"* * *

" 'It was my conclusion'—I am reading the deposition now —'It was my conclusion—'

"Well, let me read the question. The question was, 'Well, it was your conclusion at that time that you couldn't tell what had caused it, is that correct?' And your answer was, 'It was my conclusion, let me quote, I am convinced that the more detailed investigations—oh, I started here, pardon me—My interest in this problem pretty well jelled when I became convinced that it would be easier to place the burden on someone other than the client, meaning the gas company. I am convinced that the more detailed investigations which are being made,—there are authorized investigations which I did not make—will so find. This is conjecture, and that illuminating gas will not be assigned as the cause in view of the evidence which will come to light. This is a negative conclusion.'

"Now, was this your answer to the question, yes or no? A. That was my answer to your specific question."

While the witness was in Andover, he inspected what he reported as two flash fires in the lavatories of the Ohio Edison Building (which building was only partially destroyed in the

fire), one on the first floor and one in the basement. It was the belief of the witness at that time that the flash fires were caused by inflammable materials being forced out of the "trap" from the sanitary sewer and that these flash fires were related to the fire in the Isaly and Gateway Restaurant building. This opinion was in part based on the erroneous belief that the sanitary sewers that served these buildings were connected in the immediate vicinity. The witness testified:

"Q. I see. Well, it was your opinion, however, that it was between those two places that the ignition had occurred, down inside the line, and that this material had come out as a flame, is that right, in combustion? A. I think that was my first impression, yes.

"Q. And you still had that impression at the time you testified a month and a half ago, didn't you? A. Well, I was quoting my report, my impression at that time, yes. I've had no further reason to look at it or opportunity to look at it so it will have to stand as my impression made at that time when reported.

"Q. Yes, and it was your impression at that time, it was your conclusion at that time that this flash of flame in the wash basin that came from the wash basin in the Ohio Edison building was definitely related to the explosion and fire in the Andover Isaly store, is that right? A. Yes.

"* * *

"Q. And between the time you were there in Andover on August 12, 1955, up until your deposition was taken a month and a half ago, you obtained no further information about this explosion, did you? A. Oh, yes.

"Q. Well, from the time of the explosion in August of 1955 up until the time you were retained by Mr. Sindell about the 1st of February, you obtained no further information about the explosion, did you? A. That is correct.

"Q. I see. So then all the additional information that you have obtained has been since you were hired by Mr. Sindell's office about the 1st of February of this year, is that right? A. That is correct."

The witness testified that up and until the time he was hired as an expert witness in this case all he knew about the Andover explosion was as the result of his visit there on August

12, 1955, as consultant for the Andover Gas Company. Thereafter, he engaged in an examination of the testimony and evidence, including experimental preparations such as the gasoline suction pump that was constructed by a witness and said to be like those used by Ohio & Pennsylvania, to determine whether such a pump would operate with a hole in the suction line. The witness testified:

"Q. I see. And have you conducted, since the time you were retained by Mr. Sindell, any further investigation into the cause of this explosion than that which you told us about at the time of your deposition? A. Yes, I have considered all of the data supplied to me in the way of exhibits on the part of the plaintiff. I have had access to the testimony and what I have done is, from an investigation of the facts supplied me by other * * *.

"* * *

"Q. Now, sir, you said that Mr. Sindell and Mr. Markus had supplied you with certain information since you were retained by them, which you have gone over; is that correct? A. Yes.

"Q. You have been up in the building where they have their offices? A. Oh, yes.

"Q. And all of these photographs that they exhibited to you here in the course of the hypothetical question, you saw other copies of them there? A. Yes. I examined all of them.

"Q. And various drawings that are displayed around here and to which reference was made in the hypothetical question, you saw copies of them there in Sindell's offices? A. Yes.

"* * *

"Q. Had Mr. Markus ever told you what the evidence was upon which he would ask you to base the opinion? A. No. He made it available to me, and he has never instructed me as to what to make of it.

"Q. He made a transcript of the testimony available to you and you read through it; is that right? A. No. The court reporter made the transcript of it. That's what I read.

"Q. But you didn't get it from the court reporter. You got it from Mr. Markus, didn't you? A. That's right.

"Q. And my question to you was, did you read through that in an effort to find out what the testimony had been? A.

There's over 4000 pages of it. I wouldn't say I read every word of it. I read it for sense, trying to make of it what I could.

"* * *

"Q. And then, based upon the hypotheses which you had heard then for the first time, you gave your opinion as to the cause of this explosion; is that right? A. No, not exactly, because in the—I recognized much that I had read before, so I had the advantage of knowing ahead of time or, recognizing from previous readings, some of the things that he was talking about.

"Q. I see. Well, did you recognize from your previous reading all the things that he included in the question? A. I don't think I can answer that categorically yes or no.

"Q. But, of course, you had formed this opinion that you expressed before you came down here to testify; hadn't you? A. Yes.

"Q. And you formed that opinion, then, based upon only a part of the matters that you heard in the hypothetical question; is that right? A. Oh, no. I think that—I certainly had the opportunity to read everything that had been submitted.

"Q. I know. You told us you did, but you said you didn't read everything; isn't that right? A. Not word for word.

"Q. So that isn't it a fact that the opinion that you formed had been formed on only a part of the matters that were put to you in the hypothetical question? A. No. I had to answer as to what my opinion was, based upon all of the facts supplied to me in the hypothetical question.

"Q. Yes, but I say you had formed that same opinion beforehand; hadn't you? A. I had been able to study those facts previously.

"Q. All of the facts that were put to you in the hypothetical question? A. They were supplied to me.

"Q. Well, did you have access to all of the facts, did you have in your mind all of the facts that were put to you in the hypothetical question before you came down here to testify? A. Nothing was in the hypothetical question that was not in the testimony. I had access to all of the testimony.

"Q. I see. Well, why was it that you felt it was necessary to make notes when Mr. Markus put the hypothetical question to you? A. Because my answer, and my support for my answer, would have to be in conformity with what was included in the

hypothetical question, and I noted what was in the hypothetical question, irrespective of what was perhaps in the testimony. I could not answer on matters in the testimony, only as to what was in the hypothetical question.

"Q. But you told us, didn't you, that you had already formed this opinion before you came down here and heard the hypothetical question; isn't that right? A. Yes."

If there is any doubt that this witness became all things for all purposes, investigator, counsel, witness and juror, from the statements of his activities as just quoted, such question is put to rest by his testimony following a careful questioning about the notes that he took during the time the hypothetical question was being propounded, and his statement of the facts in the hypothetical question that he considered important and the facts therein stated that he disregarded as unimportant. The record discloses the following as to the way this witness came to his conclusion of fact as an expert:

"Q. You took no measurements. Well, did you have any information that you got from some other source? A. Yes.

"Q. What source did you obtain that information from? A. Well, it was not admitted in evidence. I had the geographical survey map, which I offered in evidence. I don't know whether that was admitted in evidence or not.

"Q. Well, you had a geographical survey map that was produced by Mr. Markus here in Court; is that right? A. I think I had it in my hand.

"Q. And you took into account the information that was contained on that geographical survey map in expressing the opinions that you have given here? A. In part, as to the general picture.

"Q. Although it wasn't admitted into evidence? A. I have to draw from my own personal observations as well as from facts supplied to me, whether they are in evidence or not, Mr. Crocker.

"Q. You went outside of the scope, then, of the matters that were given to you by Mr. Markus to assume in expressing the opinions that you have expressed here; is that right? A. I did not assume anything beyond my prerogative as an expert. I'm entitled to draw an opinion based upon my personal observation as well as facts supplied by others.

"Q. Well, your personal observation of what, the conditions in the village of Andover? A. Anything pertaining to the catastrophe.

"Q. I see. And, in other words, you could read the entire record of the testimony in this case and take whatever testimony you thought was significant into account, whether Mr. Markus included it in his hypothetical question or not; is that right?
"* * *

"A. Subject to my own interpretation of that testimony, yes, not taking it as fact, necessarily. I take as fact what is offered in the hypothetical question. The other testimony I have to weigh according to my own judgment as to whether it makes sense or not.

"Q. Well, then, you have taken the entire record of the testimony and weighed that in your judgment as to whether it made sense to you or not, is that right? A. Well, I have had that opportunity.
"* * *

"Q. Well, I am not clear now, sir. Did you or did you not take into account in giving the opinion that you've expressed here any of the testimony outside of the hypothetical question that Mr. Markus gave you? A. I took everything into account. I may or may not have used it.

"Q. I see. You took everything into account that you read, is that right? A. Yes.

"Q. And you put your own evaluation upon that testimony in taking it into account? A. Yes.
"* * *

"Q. In other words, a great deal of your testimony is based upon information supplied to you by other witnesses, other sources than the hypothetical question, right? A. Of necessity.
"* * *

"Q. In short, before Mr. Markus asked you to assume that there was a leak, you did assume there was a leak, didn't you, in the first answer? A. No. He didn't ask me to assume there was a leak in the first answer.

"Q. Well, did you assume there was a leak in the first answer? A. I assumed it on the basis—

"Q. Not whether you assumed it on the basis of anything.

Did you or didn't you assume there was a leak on the first answer? A. I did.''

There can be no doubt that this witness' opinion expressed at the end of the hypothetical question: ''My opinion is that the most probable cause of this catastrophe was gasoline from these two filling stations, the Ohio & Pennsylvania & the Standard Oil station on the same corner,'' was determined before the question was presented to him and was based on assumptions of fact, some of which were not in the hypothetical question but about which the witness informed himself by his private investigation and by statements made to him by other persons. There is no possible way that a jury could determine that the facts upon which this expert witness expressed his opinion were, in fact, established by sufficient evidence so that it might give consideration to the contents of the expert's opinion. The jury must have submitted to it evidence to support each of the facts presented to an expert upon which he is asked to base his opinion, and then it must determine that such facts have been established before it may consider the opinion.

In 2 Jones on Evidence (5 Ed.), 782, Section 416, is found the following:

''A hypothetical question should be so framed as to state the facts which the interrogating party claims have been proved and for which there is support in the evidence. If there is no testimony in the case tending to prove the facts which are assumed by the hypothetical question, such question is improper. If the facts assumed in the interrogatory are wholly irrelevant [*sic*] to the issue, the question should be excluded. And it has been held that the question must always include and assume all material facts which are undisputed. In short, there must be in the evidence a sufficient fact predicate to support a hypothetical question and the answer of the expert thereto.''

Also, 20 American Jurisprudence, 662, Section 788, states the following:

''Opinion testimony of qualified expert witnesses is not confined to opinions upon facts within their own personal knowledge. In those frequent instances where the witness who is offered as an expert witness has no personal knowledge of the facts, but is called to prove the scientific conclusions deducible from the facts proved by other witnesses, the usual procedure is

for counsel offering the witness, after establishing the latter's competency, to present the exact state of facts upon which opinion testimony is desired by hypothetical questions—questions which, for the purpose of the trial, assume a state of facts which has been shown by the evidence of other witnesses—and ask the witness to state his opinion based upon the facts recited in the hypothetical questions. Such questions must include only facts that are supported by evidence and should embody substantially all facts relating to the particular matter upon which an expert opinion is sought to be elicited, but they need not include all facts pertinent to the ultimate issue.''

The facts presented in a hypothetical case must fairly reflect the facts as shown by the evidence. There are a number of instances where the hypothetical question presented to Dr. Barnes does not meet the requirements of this rule. The record discloses the following:

''In addition to this, the representative of the State Fire Marshal reported that he checked the inventory records of the station back for a period of 45 days with one of the managers of the station, and according to the station records, he found a shortage of 642 gallons.

''The representative of the State Fire Marshal notified the Youngstown office of the Standard Oil Company and three employees of the Standard Oil Company were sent to the station.

''These individuals checked the records, made a pressure test and performed a pinpoint test.

''After the test and the audit, the station manager still claimed that he was short 642 gallons according to his records.

''In the pinpoint test, measurements of the contents of the regular and Ethyl tanks were tested at 3:00 o'clock p. m., and the final check was performed at 4:10 or 4:45 p. m.

''There was no variation in the measurements of the ethyl tank.

''However, the measurement of the regular tank showed a variation of 37 gallons.

''During the period between measurements, a total of 30 gallons of regular gasoline had been sold and dispensed, leaving seven gallons of regular gasoline unaccounted for in less than a two-hour interval.''

This part of the question was based on plaintiff's exhibit

89B which was a report of an investigator from the State Fire Marshal's office. That part of the report intended to be exemplified by the part of the hypothetical question just quoted is as follows:

"I checked the inventory records back for 45 days with Mr. Swezey, the manager of this station, and according to his records, we found a shortage of 642 gallons. I notified E. L. Arnold, Div. Mgr., at Youngstown, and he sent up E. Hopper, sr. examiner from Columbus, Ohio. D. D. Wortman, automotive engineer and Otto C. Haier, mgr. of safety dept. from Clev. O. They checked the records. Put on a pressure test also a pinpoint test and found no loss of gasoline. Mr. Hopper said he would send a copy of his report to our Columbus office. Mr. Swezey, Mgr. of this station, still claims he was short 642 gal. according to his records. I will check this station again before I close my investigation in Andover."

Deleting from the report, "and found no loss of gasoline," completely changed the sense of the report, and by such omission the facts contained in the report, which was a part of plaintiff's evidence, were not fairly presented to the witness.

In the case of *Manley* v. *Coleman*, 19 Ohio App., 284, the action was one in malpractice, the claim being that certain sponges used in an operation had not been removed. The opinion does not set out the facts fairly reflected by the evidence said by the appellant to have been omitted from the hypothetical question which rendered the question improper. The court, in defining the rule with regard to the contents of a hypothetical question, said, in paragraph five of the syllabus:

"5. A hypothetical question must fully and fairly reflect the facts, and the omission of facts which are in evidence renders such a question improper where what is included manifestly fails to present the facts in their true relation."

This question was also before this court in the case of *Squire* v. *Industrial Commission*, 46 Ohio Law Abs., 392. This was an action to recover death benefits, it being the claim of the plaintiff that the decedent's death resulted from an industrial injury. The deceased, working as a plumber, was required to work on the rebuilding of filter beds in the water works department of the city and while in the process of doing the work, the workman was exposed to noxious gases. The hypothetical

question did not include the fact that when doing the work, the decedent used a mask. The opinion states, in the third paragraph of the headnote, as follows:

"3. It is prejudicial error to allow an expert to answer a hypothetical question which excludes from his consideration facts already proved by the testimony upon which the question is based when a consideration of such facts is essential to the formation of an intelligent opinion concerning the matter."

Also in the case of *Chapman* v. *Industrial Commission*, 52 Ohio Law Abs., 9, a very similar question was before this court. The second paragraph of the headnotes reads:

"2. While it is for the jury to say whether or not the facts included in a hypothetical question have been established by the preponderance of the evidence in considering the weight to be given to the answer to such question, yet the omission of a circumstance which would vitally affect the conclusion of the witness makes such question objectionable."

In the case of *Olsen* v. *Electric Auto-Lite Co.*, 164 Ohio St., 283, which was an Industrial Commission case, there was involved the sufficiency of the facts stated in a hypothetical question. The cause of death was the issue in the case. It was the claim of the plaintiff that an industrial injury to the deceased's left wrist resulted in death from cancer. The evidence did not show any direct evidence of injury to the deceased's wrists. The attending physician testified that he did not have any history of injury to the left wrist and the hospital records contain no history of such injury. The facts as stated in the opinion are:

"A long and involved hypothetical question, propounded to a physician called to give expert testimony, recited incidents of decedent's employment and conditions after the accident, claimed to be the etiology of her physical condition and resultant death. The cause of death was stated to be the metastisizing of malignancy throughout the organs of the body. The witness was then asked whether, in his opinion, assuming all the suggested facts to be true, there was a causal relationship between the injury and the cause or causes of death. The answer was in the affirmative. The physician's reason for his opinion was predicated chiefly on an injury to the left wrist. This is disclosed by his testimony when he stated, 'in summary * * * an individual * * * with a pre-existing cancer who sustained general injuries

and a specific injury to the left wrist which did not heal, which resulted in an area of weakened resistance * * * in all probability attracted and caused the pre-existing cancer to spread to the wrist and all other parts of the body with resultant death.' "

The court held:

"Hypothetical questions directed to a witness must be based on facts supported by or adduced from the evidence. An expert witness may not express an opinion on matters which are within the province of a jury and as to which it is capable of making a competent finding. In the instant case, a fact of injury to the wrist occurring in the course of and arising out of the employment should have been a premise presented to the expert witness, which, if found by the jury to be true, could then have formed the basis for the acceptance of the expert opinion as to causation. Failure to do so rendered the opinion defective. *Burens* v. *Industrial Commission,* 162 Ohio St., 549, 124 N. E. (2d), 724."

Consideration must be given to the answer of the "expert witness" depended upon by the plaintiff to establish or support his claim of proximate cause between the explosion in the Gateway Restaurant and the injuries he claims to have suffered therefrom. After a very long and involved hypothetical question, the witness was instructed to assume all the facts indicated by the question "and what you have yourself personally observed at the time you were in Andover" and also to assume as to "whatever investigations you have made in connection with this explosion and about which you have testified," and upon these assumptions, to give his opinion as to the probable cause of the explosion. As quoted above, the witness answered: "My opinion is that the most probable cause of this catastrophe was gasoline from these two filling stations * * *." This opinion by which the witness determined the "most probable cause" of the explosion which caused plaintiff's injuries must have been the result of his weighing the evidence which came to his knowledge by his investigation before trial and such of the facts in the hypothetical question that, with his knowledge gained by his study of the record, he considered pertinent. There is no doubt that the witness gave careful consideration to the form of his answer ("the most probable cause") because it was repeated at least three times. To determine whether there was an escape

of gasoline from either or both of these stations which traveled through clay soil (said by the witness to be almost impervious to gasoline) by means of one or more designated channels and entered some part of the restaurant in sufficient amount, so that when vaporized and energized by a spark of some kind it caused the explosion, required a weighing of the evidence and a determination of fact through the testimony of an expert witness whose only knowledge of the facts was supplied by others. This was a jury question not within the province of an expert witness. But can it be said that his conclusion that these facts constituted "the most probable cause" was sufficiently definite to require the submission of the question to the jury? Liability for negligent conduct, if and when supported by evidence, attaches only when the negligent acts are a direct and proximate cause of the injuries claimed. By proximate cause is not meant "more likely than not" which would be a close parallel to the most probable cause when compared with others. It was said by the Supreme Court in the case of *Gedeon, Admr.,* v. *East Ohio Gas Co.,* 128 Ohio St., 335, at page 340:

"The subject has been much labored, both by courts and by the writers of text books and articles, and many phrases have been propounded as the correct expression of the basic idea: 'Natural and probable'; 'natural and proximate'; 'proximate and probable'; 'direct and natural'; these and many other phrases have been used to describe the consequences for which compensation is sought. By 'probable,' however, is not meant 'more likely than not,' but rather 'not unlikely,' or 'such a chance of harm as would induce a prudent man not to run the risk; such a chance of harmful result that a prudent man would foresee an appreciable risk that some harm would happen.' 25 Harvard Law Review, 103, 116; 33 Canada Law Journal, 717; *Gilson* v. *Delaware & Hudson Canal Co.* [65 Vt., 213, 26 A., 70], 36 Am. St. Rep., 802, note at pages 808 and 809."

In the form the question was answered, it cannot be said that the jury could conclude that, based on the facts set out in the hypothetical question, supported by some evidence, it was reasonably probable that the explosion was a proximate result of negligence charged against the defendants. All that can be said of the answer is that in relation to other causes, no matter how remote such possible claimed causes might be, the claims

against these defendants, asserted by the plaintiff, were more probable than the others, no matter how tenuous such claims might be. This must be true unless, of course, the witness was, in fact, usurping the province of the jury in attempting to state his conclusions of fact, thus dictating the result to be obtained. For the reason that in many places ·the hypothetical question put to the expert witness Barnes was indefinite, and in other instances essential facts necessary for a correct portrayal of the plaintiff's evidence were omitted, and because the conclusion was equivocal and uncertain, the plaintiff cannot benefit by the answer, without which there is no evidence in the record supporting the necessary element of proximate cause.

It must be conceded that the explosion on August 10, 1955, at Andover, Ohio, was a major catastrophe, but that fact without the necessary credible evidence tending to establish with reasonable probability all the essential elements necessary to support plaintiff's claims of negligence and proximate cause against these defendants, does not make out a case. That is to say that where the evidence is considered in its most favorable light in favor of the plaintiff's claims, reasonable minds could come to but one conclusion and that is that the plaintiff failed to support all the elements of his case by any credible evidence.

Some of the undisputed facts, as herein detailed, and the evidence quoted, including that in part presented in relation to the admissibility of the conclusions or fact testimony of certain of the experts whose testimony was depended upon as necessary to make out a prima facie case, will again be briefly referred to.

The Public Square of Andover is bounded by a very wide road. The paved portion (which is paved with blacktop from curb to curb) is 50 feet wide. In almost every case, the sidewalk in front of the buildings facing the square runs from the curb to the property line. The sanitary sewer, with tap lines running to the buildings facing the square, is located in the center of the street. The depth of the sanitary sewer below the pavement averages between seven and ten feet. It was installed in 1911 or 1912, has never been disturbed for repairs or otherwise, and the back fill has been subject to the solidifying effect of the vibration of heavy traffic for 43 years prior to 1955. The character of the ground below a thin layer of top soil outside the paved

and sidewalk areas is yellow and blue clay. The plaintiff's expert (the only witness that testified on this subject) testified that the rate which gasoline would penetrate through clay was one and one quarter inches per year. That part of the sanitary sewer said to be one of the five possible channels (such alleged channel being the only one of the five suggested from which there is a connection by way of a sewer tap entering the restaurant) through which gasoline might have been guided to the site of the explosion after leaking into the ground (if such claimed leakage has any support whatever in the evidence) from either or both of the service stations, is not closer than from 30 to 50 feet from the storage tanks and service lines, through which barriers of clay there were no "natural channels" by which gasoline could escape. It is suggested that the flood waters from the heavy rainstorm that lasted less than an hour might have assisted in transporting leaking gasoline into the restaurant. As just shown, the greater part of the area from the stations to the restaurant was covered either with pavement or sidewalk, which fact would prevent any absorption of rainwater into the ground if that would be possible through clay soil. The rainwater would, therefore, find its way from the paved surfaces into the storm sewers or flood over the surface of the pavement. Also there is no testimony that the sanitary sewer backed up into the basement of the restaurant during the storm prior to the explosion, so that street water running into the restaurant basement (which fact the evidence clearly supports) through the outside basement entrance, insofar as the floor drain in the basement had the capacity, would drain out of the basement into the sanitary sewer. This would be just the reverse of what one of the expert witnesses assumed without the support of any evidence. The plaintiff's evidence clearly shows that an unusual odor was present within the restaurant for a half to three quarters of an hour before the explosion. The witness, in trying to explain what the odor was like, used such terms as "gas," "ammonia" and the like. All such witnesses (five in number) said the odor was not that of gasoline. There is also no controversy about the fact that what was described by one of the experts, after his examination of the results, as a "flash fire" occurred in the first floor and basement lavatories of the Edison Building. Before it was

found out that the sanitary sewer, which serves the restaurant, was not the one with which the sewers in the Edison Building were connected, he reported that the cause of these fires or explosions was the same as that which caused the restaurant explosion. If this conclusion had any merit whatever, then leaking gasoline (if there was such) from either of the service stations could not have been involved because the undisputed fact is that the sewer that served the Edison Building had no connection with the sewer which served the restaurant.

With the foregoing undisputed fact situations, which with the complete failure of the evidence introduced to establish leakage of gasoline from either of the service stations here involved (as detailed in this opinion) results in the complete failure to present any credible evidence to support the claims of negligence, and the determined inadmissibility for want of evidential support of the answers of the expert witness to certain hypothetical questions, for the reasons herein stated, without which there is no evidence to support the question of proximate cause, the judgment of the trial court is affirmed.

*Judgment affirmed.*

KOVACHY, P. J., concurs.

HURD, J., dissenting. As I view this case, there is substantial evidence of a probative nature presented by the plaintiff to support the allegations of his third amended petition. Therefore, in my opinion, the trial court committed error prejudicial to plaintiff in directing a verdict for defendants at the close of plaintiff's case, by reason of which I feel obliged to dissent from the judgment of affirmance and from the lengthy opinion of over 42 pages filed by the majority. As I read the opinion, the evidence is weighed at great length and in a light most unfavorable to the plaintiff. There are a number of quotations from the cross-examination by defendants but little recognition is given to the substantial testimony favorable to the plaintiff. In fact, the opinion seems to question the veracity of the testimony and good faith of the principal expert witness presented by the plaintiff. Such a procedure is not within the function of a reviewing court and is contrary to established case law of Ohio, reference to which will hereafter be made.

The record shows also that the trial judge overruled defendants' objections to hypothetical questions submitted to professor George E. Barnes, head of the Department of Civil Engineering, Case Institute of Technology, for 22 years, which contained a factual resume of the testimony presented by plaintiff and also overruled the objections of the defendants to hypothetical questions submitted to other expert witnesses presented by the plaintiff. It is a reasonable conclusion that the trial judge must have considered, at the time of overruling these objections, that there was evidence before the court tending to support all the elements of the hypothetical questions. If this be true, the trial judge must either have ignored his previous rulings on these questions or have changed his mind completely concerning them when he directed a verdict in favor of the defendants at the close of plaintiff's case.

A careful reading of the record shows that the factual evidence presented by the plaintiff tends to prove that the explosion was caused by vaporized gasoline fumes. This factual evidence is then supported by expert testimony to the same effect. The evidence in support of the plaintiff's case, when considered alone, completely eliminates the possibility that the explosion was due to leakage of natural gas. In this connection, the record shows that a representative of the State Fire Marshal's office investigated the disaster the day after the explosion and conducted explosimeter tests, none of which showed that the explosion was due to natural gas. Natural gas leaks are continuous in nature whereas gasoline leaks and the movement of gasoline may be intermittent or caused by noncontinuous circumstances such as the torrential downpour of rain which commenced on the evening of the explosion at about 6:00 p. m. The State Fire Marshal also investigated the natural gas service line from the meter to the curb, and when tested by air pressure, it showed no leaks. The meter itself was undamaged except as to fire damage, but there was no rupture damage. The record shows clearly that there was no evidence of a natural gas loss before the court at the time the defendants' motions were granted. In any event, such evidence would be defensive matter only.

A considerable amount of factual evidence was produced by the plaintiff in support of the allegations of his petition,

which we shall not attempt to cover in detail because it would unduly lengthen this opinion. However, reference must be made to some of the factual evidence produced by the plaintiff.

The explosion occurred on August 10, 1955, shortly after 7:00 p. m., following the rainstorm above referred to. The night preceding the explosion, a truck driver, operating south on North Main Street at approximately midnight, stopped at the intersection of the public square. He heard an explosion and looked up to hear a second explosion and to see an arc of fire four to five feet high in front of his truck at a point near the storm sewer catch basin at that intersection. He described the fire as being red in color and lasting only a second. This was positive evidence of a limited noncontinuous flammable substance in the sewers and negated the theory that a natural gas leak was the cause of this phenomenon but supported the claim of the plaintiff that a small pocket of gasoline would produce such a result coming from the sewer. Notice of this was given to the village authorities.

A few days after the explosion, soil samples were taken from around the cast iron plumbing soil stack in the ruins of the restaurant building next to the wall between the basement and the crawl space. The samples of soil smelled of gasoline. Approximately one week after the explosion, a village official was called to the grocery store at the southeast corner of the public square where he smelled gasoline fumes in the rear of the building.

There are two sewer systems in the village, one sanitary and one a storm sewer. A branch of the sanitary sewer servicing both gasoline stations is also the sanitary sewer to which the restaurant building is connected. It was the gravamen of plaintiff's case that the leakage of gasoline from the Ohio & Pennsylvania station and from the Standard Oil station, operated by Swezey and Barnes, constituted the only sources from which gasoline entered the sanitary sewer system and proximately caused the explosion.

Two witnesses for plaintiff testified that they investigated and found gasoline fumes emanating from the sanitary sewer manhole at the corner in front of the Ohio & Pennsylvania station. The significance of this evidence is emphasized by the testimony that about one year earlier *200 gallons of gasoline had*

*overflowed during a delivery at the Ohio & Pennsylvania station.* On that occasion, volunteer firemen attempted to wash the gasoline into the storm sewer and gasoline fumes entered the furniture store on East Main Street across from the restaurant. Sufficient evidence was produced by the plaintiff concerning the negligence of the village of Andover tending to show that it was negligent in maintaining a sewer system without adequate ventilation, thereby permitting flammable substances to accumulate therein in dangerous quantities and in addition, the village failed to abate the nuisance, namely, gasoline in the sewer, which, in the exercise of ordinary care, it should have known to have been there. Furthermore, the village sealed over pick holes which had the effect of preventing the escape of the gasoline vapors. The plaintiff presented substantial evidence to show this.

Evidence was also introduced by plaintiff that sometime between 1950 and 1952, pump No. 1 at the Ohio & Pennsylvania station began to lose prime. The president of the Ohio & Pennsylvania Oil & Gasoline Company claimed that a valve was then installed around pump No. 1 to hold the gasoline in the line and thereafter it operated normally. The station manager denied that he knew of any such installation. Failure of a pump to hold its prime was probably due, as set forth in the evidence by plaintiff, to a tiny rust hole in the suction line that became enlarged enough to stop the pump altogether shortly after the explosion.

Considered entirely from the standpoint of plaintiff's evidence, it is significant that two weeks after the explosion the station manager was pumping gasoline out of pump No. 1 when the pump stopped entirely. He removed the pump from its stem and set it to one side on the island. No repair work was done on pump No. 1, the line servicing it, or the regular gasoline tank, during that interval.

On the afternoon of October 25, 1955, the State Fire Marshal inspected the Ohio & Pennsylvania station as part of his general investigation of the Andover explosion. Apparatus for performing a liquid-level sight glass test was attached to the underground regular gasoline system, and *850 gallons of gasoline were pumped into the 1,000 gallon regular gasoline underground tank in an attempt to fill the regular tank. Gasoline*

*drained out of the test sight glass as fast as it was put in.* The marshal discovered that the gasoline was running into and coming up a field tile inside the pump island where pump No. 1 had been removed from its normal position. On the morning of October 26, 1955, the State Fire Marshal directed that a hole be dug alongside the island at its western end, thus exposing the suction line servicing pump No. 1.

A section of the line was cleaned of surrounding soil revealing a hole in the line as it lay in the ground. A piece of pipe was then removed and the suction line plugged. When the pipe was removed, the hole was in the horizontal line near the elbow. The distance from the surface of the ground to the level of the suction line where the hole was discovered was estimated at 18 inches. The wall thickness of the section of pipe removed is slightly greater than 1/8th inch. At the hole the pipe metal comes to a "feather edge" and it is claimed by the plaintiff that it is obvious from an examination of the pipe that the 3/8ths inch irregular hole resulted from corrosion over a prolonged period of time. A new section of pipe was put in place of the removed section. Pump No. 1 was primed with 1 to 1½ quarts of gasoline and the pump operated normally thereafter without putting any gasoline into the suction line.

Considering now the Standard Oil station operated by Swezey and Barnes and located across from the public square from the restaurant, the evidence showed that the ground surface was covered with slag. Several floor drains in the station led into a catch basin in the north driveway that connected with a storm sewer behind the station. This storm sewer line ran north to the storm sewer along West Main Street, which flowed toward the square along a route adjacent to the telephone conduit and water lines. Sanitary lines from the first floor lavatories joined together in the basement, turned south and then east toward the public square, where they joined the main sewer. The sewer line continued past the Ohio & Pennsylvania station and the restaurant. On the night of the explosion, at 6:50 p. m., the storm sewer that drained the garage was full, and there was three inches of water in the parts room.

On August 16, 1955, six days after the explosion, a representative of the State Fire Marshal inspected this station. His report listed the following conditions existing:

"Driving and parking cars and trucks over tanks with no protection over tanks, three tanks above ground setting in driveway."

In addition, this representative of the State Fire Marshal reported that he checked the inventory records of the station back for a period of 45 days with one of the managers of the station, and according to the station records, *found a shortage of 642 gallons.* The representative of the State Fire Marshal notified the Youngstown office of the Standard Oil Company and three employees of the company were sent to the station. It was claimed by them that the shortage was due to cross dumping. However, after further tests, the station manager still maintained he was short 642 gallons according to his records.

After the explosion, in 1956, this station was abandoned for further use. In 1957, the underground tanks were filled with concrete and left in the ground. Shortly thereafter, the station property was sold to the Andover Bank. The Standard Oil Company arranged for a contractor to excavate these large concrete tanks and transport them on trucks to the railroad where they were then shipped on flat bed cars to Ashtabula where they were thrown into Lake Erie. Of course, the Standard Oil Company has not had an opportunity to put on its defense and no explanation is forthcoming concerning this peculiar incident which, intended or not, had the effect of destroying evidence.

There were five expert witnesses called by the plaintiff as follows:

Mr. Desso T. Mitchell, senior consulting engineer for the Jennings-Lawrence Company of Columbus, Ohio. Among other things, this witness testified, in answer to a hypothetical question, that in his opinion it was highly probable that the sanitary sewer backed up into the restaurant basement on the night of the explosion due to the overflow caused by the storm.

Professor Edward B. Evans of the Metallurgical Engineering Department of Case Institute of Technology. This witness stated, in answer to a hypothetical question, that the hole in the pipe 3/8ths inches long in its largest dimension, based on his knowledge of Ohio soils and other facts applied in the hypothetical question, could have developed in no less than one-half year and no more than eleven years prior to the removal of it

from the ground, but in all probability the hole was there at least a year prior to the time of its removal from the ground.

Mr. Albert Seidowski, who is engaged in the inspection and repair of gasoline service station equipment, testified, among other things, that the only test he considered to be satisfactory or reliable for underground equipment was the liquid-level test that had been employed by the State Fire Marshal when he inspected the Ohio & Pennsylvania station.

Professor George E. Barnes, head of the Department of Civil Engineering of Case Institute of Technology for 22 years, known as a man of very fine experience and excellent reputation in his field, testified, in answer to a long hypothetical question containing most of the factual evidence produced by plaintiff at the trial, that the most probable cause of the catastrophe was gasoline from the two filling stations, the Ohio & Pennsylvania station and the Standard Oil station on the same corner.

Professor Robert C. Weast of the Chemistry Department of Case Institute of Technology testified that in his opinion the explosion and resulting fire were most probably caused by gasoline vapors. He testified further that gasoline is the most probable cause because in this instance the violence of the explosion indicates that there was a fuel with considerable energy which caused this destruction and that one cubic foot of gasoline vapors contains approximately 5 or 6 times the energy of one cubic foot of natural gas vapors. He stated that vapors from 0.3 gallons (2½ pints) could have caused all the damage of this explosion, assuming only 1% efficiency. He reached his conclusion from the nature and extent of damage combined with an extended study of combustibles and explosives. He also testified confirming the evidence that there is no known instance in which sewage gas resulting from the decomposition of organic matter has ever reached sufficient quantity or concentration in a sewer to cause an explosion.

A question is raised in the majority opinion and in the brief of counsel for the Standard Oil Company concerning their control of the physical property at the Standard Oil station operated by Swezey and Barnes.

Upon examination of the record, the writer of this opinion is convinced that while the Standard Oil Company was out of

possession, nevertheless, sufficient evidence was produced by plaintiff which would be subject to rebuttal by the defense to show actual joint control over the physical property of this station. There was testimony to the effect that the Standard Oil Company undertook and did all maintenance work on the property and on the leased equipment. This takes the question out of the line of Ohio cases dealing with a landlord out of possession who does not exercise any control over the property. The evidence indicates that the Standard Oil Company maintained actual, if not paramount, control over the pumps and underground tanks on their property. They installed new tanks and in general supervised the operation so that it became a jury question, in view of the substantial evidence produced by plaintiff showing the joint control.

This is not intended to be a statement of all the substantial evidence presented by plaintiff in support of his position. Suffice it to say that all the evidence of plaintiff points to one factor only as the cause of the explosion and that is gasoline fumes which entered the sewer lines coming from the two gasoline stations. The defendants attempted to make their case on cross-examination plus the testimony of one witness for the defense who was allowed to testify during the plaintiff's case over the strenuous objection of the plaintiff. The testimony of this witness should be completely disregarded by the court. We have no way of knowing how much his testimony may have influenced the trial judge in directing a verdict. However, the brief of the Ohio & Pennsylvania Oil & Gasoline Company indicates reliance upon this testimony.

The controlling issue on the motion of defendants to direct a verdict was whether the plaintiff had produced evidence sufficient to support a prima facie case. I submit that the plaintiff presented ample evidence, both factual and by expert testimony, to substantiate the allegations of his petition and that certainly reasonable minds could reach different conclusions on the questions of fact presented. Something caused this explosion. Plaintiff's evidence shows that it was not natural gas or decomposition of organic material, but gasoline vapors alone. Therefore, the question of fact was for the jury, and the court should have overruled the motion to direct a verdict. This proposition is well established by authoritative decisions.

In *Hamden Lodge* v. *Ohio Fuel Gas Co.*, 127 Ohio St., 469, the Supreme Court, when abolishing the scintilla rule in Ohio, said, as appears in paragraph four of the syllabus:

"4. Where from the evidence reasonable minds may reach different conclusions upon any question of fact, such question of fact is for the jury. *The test is not whether the trial judge would set aside a verdict on the weight of the evidence.*" (Emphasis added.)

In *Wilkeson, Admr.,* v. *Erskine & Son, Inc.*, 145 Ohio St., 218, the court held, as appears in paragraph two of the syllabus:

"2. Where a defendant, at the close of all the evidence, moves the court to direct a verdict in its favor, *the plaintiff is entitled to have the evidence construed most strongly in his favor.*" (Emphasis added.)

At page 228 of the same case, the court said further:

" 'The trial judge, in ruling upon a motion, to direct a verdict * * * *must not only assume the truth of the evidence in behalf of the party against whom the motion is directed, but must construe the evidence most strongly in favor of that party,* or, *as it is sometimes expressed, must give the most favorable interpretation or intendment in his behalf, and adopt the view most favorable to his contention, or consider it in the light most favorable to him,* of which such evidence is susceptible. * * * In other words, *the evidence must be construed favorably to the submission of the case to the jury, and the trial judge should indulge in every possible consideration in favor of such submission.*' " (Emphasis added.)

It seems to me that, from the evidence, reasonable minds could reach different conclusions upon the questions of fact produced by the plaintiff, the test being not whether the trial judge would set aside a verdict on the weight of the evidence. Thus, the trial judge should have overruled the motion to direct a verdict at the close of plaintiff's case. In this connection, where such great reliance is placed in the majority opinion upon cross-examination of the expert witnesses for the plaintiff, the record shows clearly that the witnesses on redirect examination adhered to their testimony produced on direct examination. An example of this is Professor Barnes' reply to the following question presented to him on redirect examination:

"Q. Let me ask you this question, taking the facts stated

in the hypothetical question and extracting nothing from the testimony except that which has been the testimony during the course of your appearance on the stand here, and taking the facts which you are, you have made a matter of your own observation, and taking your own general knowledge and experience in this field, and all of the questions on cross-examination and redirect examination, I will ask you whether or not you have any different opinion than you previously expressed as to the probable cause—and I quote 'probable'—more likely than not, as to the cause of the explosion at the restaurant building? A. My opinion isn't changed.''

A point has been made in the majority opinion that Dr. Barnes based part of his opinion on the assumed facts and also upon his observation and experience at the scene of the catastrophe. There was no error in the manner in which the question was put or his testimony. A case in point is *De Donato* v. *Wells, Recr.*, 328 Mo., 448, 41 S. W. (2d), 184, which has been annotated at length in 82 A. L. R., 1331, the headnote of which is as follows:

''1. An expert witness may give an opinion either from facts within his own knowledge and observation, or from hypothetical facts, or from the two combined.''

Under these and similar circumstances, the law is well settled that the weight of the evidence and the credibility of the witnesses is for the jury alone and not for the court to decide.

It is not the province of this court to theorize as to the cause of this explosion or to determine facts as on a trial *de novo*. We must be guided entirely by the evidence adduced on plaintiff's case for the purpose of the motion. In this case the evidence of plaintiff is such that the motion for a directed verdict should have. been overruled.

For the reasons stated, the judgment should be reversed and the cause remanded for further proceedings according to law.